**Randy Wayne McCLEARY, Plaintiff,**

v.

**Richard D. KELLY, Individually and in his official capacity as Acting Superintendent of the State Correctional Institution at Huntingdon, Pennsylvania, et al., Defendants.**

**Civ. No. 73–742.**

United States District Court, M. D. Pennsylvania.

May 28, 1974.

Fred Farber, Legal Services for Bedford-Fulton-Huntingdon Counties, Inc., State College, Pa., for plaintiff.

Marc Kapustin, Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., for defendants.

SHERIDAN, Chief Judge.

Plaintiff, presently an inmate at the State Correctional Institution at Huntingdon, Pennsylvania, brought this action under the Civil Rights Act, 42 U.S.C.A. § 1983, seeking declaratory and injunctive relief and damages against the defendants. Federal jurisdiction is invoked under 28 U.S.C.A. §§ 2201, 2202 and 1343. In accordance with Rule 65(a)(2) of the Federal Rules of Civil Procedure, the case was set down for non-jury trial on the merits thereby consolidating the trial with the hearing on the preliminary injunction. At the trial the following facts emerged.

On December 16, 1973, a concert for the inmates was held at the State Correctional Institution at Huntingdon. The concert was sponsored by the Altar Rock Jaycees, the inmate chapter of the Junior Chamber of Commerce at Huntingdon, and had been approved by the prison administration. However, the nature of the concert was misrepresented to the prison authorities and what was supposed to be purely musical entertainment turned out to be a rally consisting of political speeches and politicized songs with the Attica riot and the overthrow of the prison establishment as the major themes. Prison officers on duty at the concert became concerned about the security of the institution during the concert as the inmates reacted to the propaganda contained in the speeches and songs. During the course of the concert, metal buttons which bore the imprint "ATTICA" and a publication titled the "Attica News" were distributed *surreptitiously* and without authorization to some of the inmates by members of the performing group.[1]

■ Plaintiff received an "Attica" button at the concert. The following day he wore the button on his shirt to the dining hall. He was approached by defendant Wakefield, a correctional officer at Huntingdon, who informed plaintiff that the button was contraband and therefore he was confiscating it. Plaintiff asked Wakefield for a receipt for the button and Wakefield responded by instructing him to see defendant Wicker, the correctional officer in charge at the dining hall. Plaintiff approached Wicker with his request for a receipt, whereupon Wicker took the button from plaintiff and told him that receipts were not given for contraband. Plaintiff claims that at this point Wicker removed from his back pocket a copy of the "Attica News." Defendant Wicker testified that he did not see and hence did not take from the plaintiff any newspaper. The court finds that a copy of the "Attica News" was not confiscated from the plaintiff. Moreover, the "Attica News" would have been contraband since it was distributed at the concert in the same manner the "Attica" button had been distributed.

■■ The Rules at Huntingdon provide in part as follows with respect to contraband:

## "GENERAL RULES

" . . .

"13. Inmates are not to receive of [sic] give any articles whatsoever to visitors, except by permission of the Superintendent or Deputy Superintendent

" . . .

"16. Liquor, drugs, and unauthorized pictures or literature are strictly forbidden and any violation of this rule will result in disciplinary action.

" . . ."

## "CONTRABAND

"1. The possession of unauthorized articles on your person, in your be-

---

1. While plaintiff and another inmate, Paul T. Lyons, testified that the "Attica" buttons and the "Attica News" were distributed in plain view of the prison guards on duty at the concert, William Kocick, Acting Major of the guards at Huntingdon, who attended the concert testified that he and the other guards did not observe the distribution of the buttons or newspapers, and that if they had, they would have confiscated the items as contraband.

longings, or in your living quarters, anything that is not personally issued to you by the Institution or sent to you through the Mail Room or purchased by you at the Institution Commississary [sic] is forbidden. You are not permitted to have anything that is not authorized by the regulations of this Institution. Having contraband is a serious offense.

" . . .

"4. Any person who introduces or attempts to introduce, into or upon the grounds of this Institution, any narcotics, drugs, weapons, or any contraband articles or thing, or any type of contraband letter or message, intended to be received by any inmate, is guilty of a serious offense, and will be prosecuted under the existing law of the state."

The above regulations clearly are constitutional. The prison authorities obviously have a right to screen and control the introduction of materials into the correctional institution. The internal order and security of the prison depend on the effective exercise of such control. Since the "Attica" button in the possession of the plaintiff clearly was contraband, its confiscation by the prison authorities did not violate any constitutional guarantee. Therefore, plaintiff's request for compensatory and punitive damages and for a preliminary and permanent injunction will be denied.

█ There remains plaintiff's contention that in violation of his constitutional rights he is not receiving the *Harrisburg Independent Press*, a weekly newspaper to which he has subscribed. The publisher of the *Independent Press* testified that he has been mailing the newspaper to the plaintiff since the beginning of January. The prison administration at Huntingdon has disapproved the *Independent Press*; the censorship committee recommended that the newspaper not be permitted due to its inflammatory content. The Superintendent at Huntingdon agreed with the censorship committee's recommendation and the *Independent Press* is banned at the correctional institution. The written regulations containing the criteria utilized to determine whether a publication shall be approved for receipt by inmates at Huntingdon provide as follows:

"A. Requests for and receipt of publications shall be disapproved when the publications contain the following:

1. Information regarding the manufacture of explosives, incendiaries, weapons or escape devices.

2. Instructions regarding the ingredients and/or manufacture of poisons or drugs.

3. Clearly inflammatory writings advocating violence, insurrection or guerrilla warfare against the government or any of its institutions.

4. Judicially defined obscenity.

"B. No legitimate publication shall be prohibited solely on the basis that such publication is critical of penal institutions in general, of a particular institution, of a particular institutional staff member, of an official of the Bureau of Correction or of a correctional or penological practice in this or in any other jurisdiction.

"C. The above criteria should not be interpreted so broadly as to affect recognized textbooks in chemistry, physics or the social sciences."

In Procunier v. Martinez, 1974, 42 U. S.L.W. 4606, —— U.S. ——, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court established the following standard for deciding whether a particular regulation or practice relating to inmate correspondence constitutes an impermissible restraint of first amendment liberties:

" . . . One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task. The identifiable governmental interests at stake in this task are the preservation of internal order and discipline, the maintenance of institutional security

against escape or unauthorized entry, and the rehabilitation of the prisoners. While the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation, the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence. . . .

"Applying the teachings of our prior decisions to the instant context, we hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial govermental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad. This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude · in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally nec-

essary to protect one or more of the legitimate governmental interests identified above." (Footnotes omitted.)

Applying the above standard to the criteria with respect to publications embodied in the rules at the Huntingdon institution, supra, the court holds that the criteria are constitutional. The Huntingdon rules authorizing censorship of publications further one or more of the legitimate penal administration interests of security, order, and rehabilitation.[2] The criteria specifically prohibit the censorship of publications on the ground they contain unwelcome criticism of prison officials, practices, or policies.

█ The court is confronted with the difficult question of whether a newspaper can be banned in general because some or most of its issues violate the valid censorship criteria, or whether each issue of the publication must be examined by the prison officials and approved or disapproved on an issue by issue basis. The government's interest in being able to effectively prevent the introduction of publications into the institution which would interfere with the substantial penal interests of security, order, and rehabilitation must be weighed against the infringement of protected first amendment liberties. It should be noted that the Supreme Court in Procunier v. Martinez, supra, did not reach the issue of an inmate's right to receive newspapers or publications. Indeed, the Court's decision in *Procunier* is based on the first amendment rights of the *outsider* to communicate with or receive communication from an inmate, *not* on any right of the prisoner.

"We begin our analysis of the proper standard of review for constitutional challenges to censorship of prisoner mail with a somewhat different premise than that taken by the other federal courts that have considered the question. For the most part, these

2. See footnotes 14 and 15 of the *Procunier* opinion, 42 U.S.L.W. at 4612-4613 [94 S.Ct. at 1812-1813], for examples of regulations with respect to censorship of prisoner mail that apparently the Court would hold constitutional.

courts have dealt with challenges to censorship of prisoner mail as involving broad questions of 'prisoners' rights.' This case is no exception. The District Court stated the issue in general terms as 'the applicability of First Amendment rights to prison inmates. . . .' [Martinez v. Procunier] 354 F.Supp. [1092] at 1096, and the arguments of the parties reflect the assumption that the resolution of this case requires an assessment of the extent to which prisoners may claim First Amendment freedoms. *In our view this inquiry is unnecessary. In determining the proper standard of review for prison restrictions on inmate correspondence, we have no occasion to consider the extent to which an individual's right to free speech survives incarceration, for a narrower basis of decision is at hand.* In the case of direct personal correspondence between inmates and those who have a particularized interest in communicating with them, mail censorship implicates more than the right of prisoners.

"Communication by letter is not accomplished by the act of writing words on paper. Rather, it is effected only when the letter is read by the addressee. Both parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each. Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech. And this does not depend on whether the nonprisoner correspondent is the author or intended recipient of a particular letter, for the addressee as well as the sender of direct personal correspondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication.
. . .

"Accordingly, we reject any attempt to justify censorship of inmate correspondence merely by reference to certain assumptions about the legal status of prisoners. . . . [T]he First Amendment liberties of free citizens are implicated in censorship of prisoner mail. We therefore turn for guidance not to cases involving questions of 'prisoners' rights' but to decisions of this Court dealing with the general problem of incidental restrictions on First Amendment liberties imposed in furtherance of legitimate governmental activities." (Footnotes omitted.) (Emphasis supplied.)

In addition, the Court in footnote 11 of its opinion made clear that different considerations may come into play in the case of mass mailings as opposed to "personal correspondence" to or from those having a "particularized interest" in communicating with inmates.

■■ Having weighed the legitimate penal interests against the competing first amendment interests, and having examined representative copies of the *Independent Press*, the court holds that the newspaper cannot be banned completely; rather, each issue of the weekly newspaper must be examined in terms of the censorship criteria and only those editions which violate those criteria can be rejected. The limitation of first amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Procunier v. Martinez, 42 U.S.L.W. at 4612, [94 S.Ct. at 1812]. The *Independent Press* is not voluminous and is published weekly. Based on an examination of the issues of the paper admitted into evidence, it would appear that many issues of the paper, under the censorship criteria utilized at Huntingdon, should be approved for receipt by inmates. Two other prisons, the Federal Penitentiary at Lewisburg and the Dauphin County Prison, allow its inmates to receive the *Independent Press*, screening it on an issue by issue basis. After having weighed

the additional burden on the Huntingdon prison administration that will result from having to make an issue by issue determination with respect to the *Independent Press* against the infringement on first amendment rights that results from a general ban on the newspaper, the court has concluded that requiring a separate determination with respect to each issue of the newspaper would not be an undue burden on the prison administration and is constitutionally required.

The court's decision here does *not* mean that a prison can never adopt a general ban on a publication. A prison's general ban on a publication may be permissible where the past history of the publication makes clear that due to its content some of its past issues could have been constitutionally censored, and the prison authorities are able to demonstrate that an issue by issue determination would constitute an undue burden on the prison administration, as might be the case with respect to a voluminous daily publication. In short, each case must be determined on its own facts.

The court here holds only that with respect to the *Independent Press* the prison authorities must apply the censorship criteria to each issue and allow those issues not containing prohibited material to be received by the inmate who has subscribed to the paper. The court declares the general ban against the newspaper unconstitutional and hence unenforceable.

A decision by a prison to censor or withhold delivery of a publication must be accompanied by minimum procedural safeguards. Procunier v. Martinez, 42 U.S.L.W. at 4613 [94 S.Ct. at 1813]. Thus, an opportunity for review of decisions to censor or withhold publications must be provided for. The procedures with respect to approval or disap-

proval of outside publications at Huntingdon are embodied in the regulations and provide as follows:

"III. GENERAL PROCEDURES

"A. All publications shall be mailed directly from the original source, publisher, magazine distributor, department store or book store with the exception of small letter-size religious tracts and pamphlets which may be received in regular correspondence from family, friends or religious advisor.

"B. An institutional staff committee of treatment and custodial representatives appointed by the Superintendent shall be responsible for clearing resident requests for outside publications and for reviewing publications received.

"C. All decisions with respect to the approval or disapproval of outside publications shall be based on the criteria of Paragraph IV. below.

"D. Residents shall have the right to appeal to the Superintendent any staff committee decision disapproving a publication.

"E. Should the Superintendent concur with the staff committee's disapproval, a resident may appeal to the Commissioner of Correction who shall evaluate the publication in conjunction with the Office of the Attorney General. The findings shall be communicated to all institutions."

The court holds that the above procedure provides the minimum procedural safeguards that are constitutionally required by the due process clause of the fourteenth amendment.

This memorandum shall constitute the court's findings of fact and conclusions of law.