Guadalupe GUAJARDO, Jr., et al., Plaintiffs-Appellees, Cross-Appellants,

v.

W. J. ESTELLE, Jr., Director, Texas Department of Corrections, et al., Defendants-Appellants, Cross-Appellees.

No. 77–2226.

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1978.

John L. Hill, Atty. Gen., Gilbert J. Pena, Asst. Atty. Gen., Ed Idar, Jr., Sp. Asst. Atty. Gen., Nancy M. Simonson, Asst. Atty. Gen., David M. Kendall, Jr., 1st Asst. Atty. Gen., Daniel E. Maeso, Asst. Atty. Gen., Austin, Tex., for plaintiffs-appellees, cross-appellants.

Ann Lents, Harry M. Reasoner, John L. Carter, Scott J. Atlas, Houston, Tex., for defendants-appellants, cross-appellees.

Before THORNBERRY, RONEY and HILL, Circuit Judges.

THORNBERRY, Circuit Judge:

In 1971 plaintiff Guadalupe Guajardo, an inmate of the Texas Department of Corrections, filed suit under 42 U.S.C. § 1983 on behalf of himself and other TDC inmates to challenge the constitutionality of the TDC correspondence rules and practices then in effect. The district court found a number of the TDC rules constitutionally invalid and ordered injunctive relief. *Guajardo v. McAdams,* 349 F.Supp. 211 (S.D.Tex.1972). On appeal the Fifth Circuit reversed and remanded, holding that the Texas Department of Correction's rules and regulations applied statewide and could be enjoined only by a three-judge court. *Sands v. Wainwright,* 491 F.2d 417 (5 Cir. 1973), *cert. denied,* 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974).

After the Fifth Circuit's remand order, the named plaintiff and the defendants began lengthy settlement negotiations culminating in the submission of a proposed settlement agreement preliminarily approved by the district court on June 9, 1976. Although the proposed TDC rules were considerably more liberal than those challenged in the original litigation, the plaintiffs, encouraged by the Fifth Circuit decision in *Taylor v. Sterrett,* 532 F.2d 462 (5 Cir. 1976) and the comments and objections of other class members, determined that the proposed rules did not fully comply with constitutional requirements. The TDC refused to further concede, subsequent negotiations were not wholly successful, and the plaintiffs moved to vacate the settlement. The district court severed for trial the issues still in dispute and conditionally approved the rules as further modified.

A second trial before the court focused on the constitutionality of the rules as approved. The district court again found a number of the rules below the constitutional benchmark. In this appeal the TDC challenges those adverse rulings, raises two procedural issues, and complains of the award of attorneys' fees. The plaintiffs seek to preserve the territory gained below and continue to assert that an even more liberal interpretation of some rules is necessary. Because of the complexity of the case, we deal first with the procedural objections raised by the TDC. The district court opinion provides a helpful outline for dealing with correspondence rules. For simplification's sake we continue to follow it on this appeal. Finally, we deal separately with the attorneys' fees issue.

## I. Procedural Questions

### A. The Three-Judge Court Issue

The TDC first argues that a three-judge court was necessary to the decision of the issues before the district court. It contends that the plaintiffs seek to avoid a three-judge court by a two step process—first by seeking declaratory relief and then, when the TDC refuses to comply, instituting action to enjoin enforcement of the rules.

 The plaintiff's complaint, as amended, seeks only declaratory relief. Traditionally a complaint seeking only declaratory relief has not required the convening of a three-judge court. *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1962); *Riddell v. National Democratic Party,* 508 F.2d 770 (5 Cir. 1975). The withdrawal or dismissal of a claim for injunctive relief has permitted a single district judge to rule on the remaining declaratory judgment count. *Nieves v. Oswald,* 498 F.2d 802 (2 Cir. 1974); *Seergy v. Kings County Republican Committee,* 459 F.2d 308 (2 Cir. 1972); *Rosario v. Rockefeller,* 458 F.2d 649 (2 Cir.), aff'd, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1972). *See also Stone v. Philbrook,* 528 F.2d 1084 (2 Cir. 1975). The test is one of effect; if the declaration of rights would have a restraining effect, and a court might deem an injunction appropriate to accompany the declaration, a plaintiff's use of the declaratory judgment form would not defeat the need for a three-judge court. *See Jeanette Rankin Brigade v. Chief of Capitol Police,* 137 U.S.App.D.C. 155, 421 F.2d 1090, aff'd, 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972). The effect of declaratory relief in this action is not the same as that of injunctive relief. The TDC has been free to apply its proposed regulations pending this court's review of the district court's decision. That freedom precludes a claim by the state that the operation of the statutory scheme has been so disrupted that the relief given amounted to an injunction. Since this action has not paralyzed TDC's enforcement of its correspondence rules, we cannot say that the sought after relief amounts to an injunction requiring a three-judge panel.[1]

### B. The Jury Trial Issue

After the plaintiffs filed their amended complaint seeking only declaratory relief, the state asked for a jury trial. Rule 38(b) states that any party may demand a jury trial of any issue triable as of right by a jury by serving upon the other parties a demand therefor in writing any time after the commencement of the action and not later than ten days after the service of the last pleading directed to such an issue.

 We need not detain ourselves with the question whether an issue existed that would have produced a right to trial by jury. Plaintiffs commenced this action by asking for both injunctive and declaratory relief. Although they would not have been entitled to a jury trial on equitable issues, they might have demanded a jury trial on factual issues underlying the declaratory judgment action. 5 J. Moore, Federal Practice ¶ 38.29. If the claim were legal, its jury-generating aspect could not be lost by joinder with claims for equitable relief. *Dairy Queen v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theaters v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Assuming that a legal claim existed, the issue is whether the state sought a jury trial within ten days from the last complaint raising it as an issue. A complaint "raises an issue" only once within Rule 38(b)'s meaning—when it introduces it

---

1. The three-judge court act, 28 U.S.C. § 2281, was repealed by Congress in 1976. The repeal, however, did not extend to cases in which suit had been commenced before August 12, 1976.

The three-judge court was the subject of much criticism while it lived. The Supreme Court constantly reminded lower courts that the act was to be construed "technically".

*Phillips v. United States,* 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941). Congressional restriction of the statute's purview adds weight to our conclusion that plaintiffs' withdrawal of their claim for injunctive relief should permit the action to proceed without a three-judge court.

for the first time. Amendments not introducing new issues will not give rise to a demand for a jury trial. *Connecticut General Life Insurance Co. v. Breslin,* 332 F.2d 928 (5 Cir. 1964) (defendant's amended answer did not raise issues materially different from those presented by the original answer and waiver of jury trial remained effective); *Swofford v. B. & W., Inc.,* 34 F.R.D. 15 (S.D.Tex.1963) (where new jury issues are created by amendment a party may properly demand a jury trial, but an amendment which neither changes the nature of the case nor introduces new issues does not renew that right). The term "new issues" has been interpreted to mean new issues of fact and not new theories of recovery. *See Jackson v. Airways Parking Co.,* 297 F.Supp. 1366 (D.Ga.1969). *See also Trixler Brokerage Co. v. Ralston Purina Co.,* 505 F.2d 1045 (9 Cir. 1974). The record in this case reveals that the plaintiffs' amended complaints are restatements of their earlier pleadings and do not raise new issues which give rise to a demand for a jury trial.

## II. Constitutionality of the TDC Correspondence Rules

The merits of this case involve a variety of correspondence rules. The district court's approach divided correspondence into the several categories of general correspondence, special correspondence (including correspondence to courts, attorneys and the media) and publications. We think that approach is a helpful one and maintain it here.

A. General Correspondence

The content of general correspondence is implied by its name. General correspondence is mail that flows between a TDC inmate and the general public. TDC's proposed rules would permit a general correspondence list of ten persons not including spouses, parents, children, brothers or sisters of the inmate and also not including religious leaders, special correspondents, attorneys or media correspondents. TDC Rule 3.9.1. Inmates could write up to forty

letters to persons on their approved correspondence list, but the TDC would require that prior approval of general correspondents be obtained and that additions and deletions to the approved list be made with institutional approval and only every fifteen days.

The district court struck down the numerical limitations on the general correspondence list and the prior approval requirement. It upheld the use of a "negative mail list", which would permit the TDC to deny inmates permission to correspond with persons who have objected to further correspondence and with individuals who have attempted to introduce contraband or committed other serious violations of the correspondence rules. It also upheld the censorship of incoming and outgoing general correspondence. We think the district court was correct in its evaluation of the first amendment requirements in this aspect of the case.

We begin our analysis with *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In that case the Supreme Court held that censorship of prison mail was justified if the regulation or practice in question furthered an important or substantial government interest unrelated to the suppression of expression. Prison officials were required to show that a regulation authorizing mail censorship furthered one or more substantial governmental interests in security, order and rehabilitation and that the limitation of first amendment freedoms was no greater than essential to the protection of the particular government interest involved. 416 U.S. at 412–14, 94 S.Ct. at 1811.

*Martinez's* rule was based upon the Court's perception of the constitutional rights of individuals who engaged in direct, particularized personal correspondence with prisoners. 416 U.S. at 408–09, 94 S.Ct. at 1809. Guided by decisions dealing with the general problem of restrictions on first amendment liberties, the Court rejected cases involving "prisoners' rights" as a source of the standard to be employed. Thus, *Martinez* decided not the parameters

of the rights of free speech surviving incarceration in a prison, but the limited situations in which prison regulations could have the effect of inhibiting the first amendment rights of persons wishing to correspond with inmates. Beginning from that notion we analyze the TDC rules in question.

 The proposed rules on general correspondence would permit the TDC to require an inmate to secure prior approval before beginning correspondence with an individual.[2] The rule states that no person shall be disapproved unless the Bureau of Classification finds that allowing inmate correspondence with that person would threaten the internal order and discipline of the prison or the maintenance of security or the inmate's rehabilitation. The rules also state that the fact that a would-be correspondent is a former felon or an inmate of another TDC unit is not, standing alone, sufficient to deny correspondence privileges. The district court found first that the TDC's past behavior demonstrated a propensity toward blanket denials of permission to correspond when the would-be correspondent belonged to an "undesirable group". Specifically the TDC's past, habitual rejection of prison reform organizations, "left wing" groups, married women, former inmates, known homosexuals and inmates at other institutions caused the district court to note that TDC's disapproval had been arbitrary and capricious. The district court also concluded that the prior approval requirement was not essential to the protection of TDC's legitimate *Martinez* interests.

The state urged that this court adopt a rule that would defer to reasonable and sincere beliefs of the TDC officials. That was the standard applied in *Jones v. North Carolina Prisoner's Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), in which the Court held that the North Carolina rule prohibiting prisoners from soliciting other inmates to join the

union and barring union meetings and bulk mailings did not impermissibly infringe on the first amendment rights of prisoners. But *Jones,* in which first amendment speech rights of the public were barely implicated, cannot furnish the model for this case in which they are paramount. 433 U.S. at 128, 97 S.Ct. at 2540. The Court made careful distinction between the prisoners' rights asserted in *Jones* and the kind of rights that were the foundation for *Martinez. Id.* The Court's rule in *Jones* was designed to thwart a situation which involved a good deal more than the simple expression of individual views. 433 U.S. at 130, 97 S.Ct. at 2541. Moreover, in *Jones,* the Court dealt strictly with the rights of prisoners and their activities within the prison unit. Since first amendment associational rights were implicitly circumscribed in that situation, the ban on solicitation and mass meeting was a logical conclusion. We deal with a different problem since the general correspondence rules touch not only the rights of the prisoners to receive mail but the rights of persons not incarcerated to send mail to the prison and to receive mail from those imprisoned in it.

The TDC argues also that this court should defer to the reasonable and sincere belief of prison officials that the prior approval rule is necessary to further security, order and rehabilitation. They contend that theirs is a "finely tuned" security system and that the large number of inmates who go outside of the prison confines each day necessitates strict security measures. None of these arguments is persuasive. TDC apparently applies stringent security measures to inmates while they are outside of the walls and upon their return. Inmates coming into the prison are strip searched; while outside they are watched by armed guards. Prison officials argued that if prisoners were free to write to individuals without prior approval, they would

---

**2.** An earlier panel of this court, *Gates v. Collier,* 525 F.2d 965 (5 Cir. 1976), affirmed a district court order in that same case, *Gates v. Collier,* 390 F.Supp. 482 (N.D.Miss.1975), which permitted those restrictions on numerosity and addressees "imposed by the Associate Superintendent of Custody". We think *Gates* inapposite here. That order was an interim one to be used for the time during which final regulations were written. We do not believe a final rule of such vagueness could have withstood *Martinez* scrutiny.

write letters to persons on the outside directing them to stash contraband in the open areas where prisoners work. The answer to these contentions is twofold. First, restrictions on mail recipients have only minimal influence, if any, on the security risks involved when large numbers of prisoners work outside the unit confines. Second, the dispositive factor is that the TDC retains the right to read all general correspondence. Given that ability, they are armed with the essential weapon for combating smuggling and escape plans.

Under the TDC's proposed rule it would evaluate correspondents against their likelihood of impinging on *Martinez* interests before any mail passed between the prisoner and the correspondent. Such a rule inherently encourages censorship based upon speculation. *Martinez* teaches that the limitations on first amendment freedoms must be no greater than is essential to the protection of the particular interest involved and that a regulation that furthers an important or substantial government interest will nevertheless be invalid if its sweep is unnecessarily broad. 416 U.S. at 412–14; 94 S.Ct. at 1811. Because TDC would determine the right to send or receive mail before any letters had been written, no pre-

cise standards would exist for determining whether an individual posed a threat to *Martinez* interests. The standards available to prison officials, such as membership in radical political groups, are not a permissible guide.[3]

TDC's decision to interrupt the communication process before any letters are sent or received is somewhat akin to a prior restraint. Any prior restraint on expression comes to a court with a heavy presumption against its constitutional validity. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968). Prior restraints are generally decried because they tend to chill first amendment freedom of expression; in the same manner, a prior approval rule has an adverse effect on the right of the correspondent to advocate in other forums ideas not popular with prison officials. We think that the record contains sufficient support for the district judge's conclusion that the prior approval of correspondents by TDC officials was not essential to the state's interest in security, order or rehabilitation.[4]

3. In *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), the Supreme Court held that a state college could not refuse to grant permission to organize an SDS chapter merely because the local group wished to identify with the national group and that group's purportedly dangerous philosophy. The Court remanded the case for a determination whether the students had *in fact* refused to accept reasonable governing regulations. Similarly group membership or identification would not, in this case, be sufficient to deny approval to a correspondent. [emphasis added].

4. We note at the outset that the TDC actually made two separate and distinct arguments for its prior approval requirement. In addition to the argument, set out in detail earlier, that lack of a prior approval requirement would prevent TDC from uncovering escape plans and from detecting contraband, the TDC argued strongly that the prior approval requirement was necessary to protect individuals who did not wish to receive mail from prisoners. Our analysis, based upon the rights of the would-be correspondents, assumes that we deal primarily with

persons who wish to write to inmates but are not allowed to do so.

The defendants' exhibits contained examples of letters that the TDC interpreted as demonstrative of the need for close supervision of prisoner correspondence. The most frequent violation of prison rules occurred when a prisoner received mail which appeared to have been written by an individual on the prisoner's mail list but was, in actuality, from an unapproved correspondent. The bulk of these letters were from women who were not married to the inmate and who had posed as a spouse or mother. We have examined these letters and find that generally the sole ground for objection was that there was no marital or familial relationship. The correspondents, with whose rights we are primarily concerned, wished to write to the prisoners. Further there was nothing in the correspondence that threatened substantial interests under *Martinez.* We think that the lack of marital or familial relationship is not sufficient to overcome the first amendment right of the correspondents.

Another group of letters pose a more serious problem. These were letters which were writ-

■ TDC's proposed rules would also permit a numerical restriction to be imposed on inmate mail and permit prison officials to censor both incoming and outgoing general correspondence. The numerical restriction is advanced by the prison officials on the ground that the district court's decision left them with only censorship by reading and that large volumes of mail cannot be read. The district court ruled that the state could not assert its administrative convenience as a ground for the numerical limitation without showing that order, security or rehabilitation were affected. It also found that the evidence demonstrated that the amount of mail sent and received had no effect on prison security.

We note first that this dispute covers only direct, personal correspondence between inmates and persons outside the prison. Clearly the prison officials may control bulk mailings. *Jones v. North Carolina Prisoner's Labor Union, supra,* 97 S.Ct. at 2540. The record indicates that volume restrictions were sporadically enforced in the past. Indeed it seems possible that the work hours used to sort and keep account of each prisoner's total letters for the week could be spent as additional time to read incoming and outgoing mail. We uphold the district court's striking down of the numerical limitation.

■ Plaintiffs argued against the reading of general correspondence. They contended that neither order nor security were enhanced by that censorship and that the prison's permission for other uncensored communication, such as family visits, belied the TDC's interest in controlling communication with the outside world. We find those arguments unconvincing. *Martinez*

ten to individuals who strenuously objected to receiving them. Some of them were letters that threatened physical harm or were offensive because of their explicit sexual content. Generally these letters came to TDC's attention because the recipients wrote to the prison authorities asking that they be stopped. Some objectors, however, particularly those who were parents of young women, simply objected to their daughters receiving mail from a prisoner. Irate husbands also fell into this latter category. A careful examination of all of the letters demonstrated that those which were patently offensive because of sexual references or abusive language would have been spotted by minimum, cursory readings. TDC certainly has the power to read these letters and to block such offensive correspondence. Letters that were innocuous, except for the fact that the recipient did not wish to receive them would, of course, go out under the closest censorship. A reading of the letters included in the defendants' exhibits revealed that most of the correspondents were not strangers to the inmates. *Semble Morales v. Schmidt,* 340 F.Supp. 544 (W.D.Wis.1972), *rev'd and remanded,* 489 F.2d 1335, *aff'd,* 494 F.2d 85 (7 Cir. 1974). While it is not the province of the TDC to mediate personal relationships that do not infringe upon the security, order or rehabilitations goals of the institution, we are mindful that general correspondence rights have been grounded on the constitutional rights of the would-be correspondent rather than on those of the prisoner. For that reason we think that the TDC might protect the public from unwanted letters in the following manner without violating first amendment freedoms. An inmate wishing to correspond with an individual from whom he has received no mail might first be required to send an institutionally printed postcard stating his name, address and prison number and clearly identifying him as a prison inmate to the individual with whom he wishes to correspond. The card could state simply that prisoner X wishes to correspond with the addressee and that *unless* objection is received within ten days he will be permitted to do so. That procedure would place the choice on the source of the constitutional right and protect persons who do not wish to hear from prison inmates at all.

We recognize that the Eighth Circuit struck down a requirement that potential correspondents' approval be secured in *Finney v. Arkansas Bd. of Correction,* 505 F.2d 194 (8 Cir. 1975). That decision, unlike ours today, rested upon the first amendment rights of the prisoners themselves. *Id.* at 211. Whatever those rights may be, we think that it is clear that the Supreme Court in *Martinez, supra,* spoke primarily to the rights of the potential correspondents. It is illogical to permit the first amendment deprivations of some individuals to be redressed by a rule that unnecessarily invades the privacy of others. We do not think that the right to be permitted to correspond freely with inmates must include the duty to receive unwanted letters. The tail need not wag the dog. We point out that unlike the Arkansas rule, prison official approval is not required. The only approval needed is that of the correspondent, with whose rights we are concerned in the first instance. *Cf. Rowan v. United States Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).

clearly sets out security, order and rehabilitation as viable state interest in this matter. Censorship of a prisoner's mail in this manner is entirely consistent with the theory that the first amendment rights of the individual wishing to communicate with him must be protected by the least restrictive rule. In this way only those individuals whose communications pose a substantial threat to security, order or rehabilitation are rejected as correspondents. Additionally, the rejection takes place at a point in time when prison officials have a concrete object to evaluate and can be more objective about the demonstrable harm from the communication.

■ The TDC has specific regulations that set out the grounds for rejecting a letter. The district court struck down two of these, ruling that the TDC could not reject a letter that (1) concerns plans for violation of prison rules and (2) that contained a graphic presentation of sexual behavior that is in violation of the law. The district court noted that behavior such as criticism of prison officials or disrespectful attitude toward prison employees violates prison disciplinary rules and reasoned that a prison censor might interpret this rule to mean that letters containing disrespectful comments could be intercepted. *Martinez, supra,* emphatically states that mere complaints and disrespectful comments cannot be grounds for refusing to send or deliver a letter. We think that the rule is not overly vague and that prison authorities are capable of its even-handed enforcement.[5] The rule is properly directed toward permitting authorities to censor mail containing escape plans, plans for disruption of the prison system or work routine, or plans for the importation of contraband. *See McKinney v. DeBord,* 507 F.2d 501 (9 Cir. 1974). We think that these are the serious types of violations that it was designed to reach. The district court erred when it struck down the rule.

The district court also struck down the rule which would have permitted censorship of material containing a "graphic presentation of sexual behavior that is in violation of the law". It held that rule infirm because it set up mail room officers as the arbiters of obscenity. We disagree. If officers were required to determine whether the "graphic presentation" violated the law, they would necessarily be determining whether the drawing or description were obscene. The rule, however, is susceptible to another, more logical, interpretation— that authorities must determine whether or not the sexual behavior is in violation of the law. We think that the words "graphic presentation" were used in the statute to permit it to cover both writing and drawing; we do not think that they were intended as a quantifier for obscenity. The determination to be made by the mail room censors is whether the described behavior violates the penal code, not whether the description is obscene. The district court erred in striking down the rule.

■ Finally, the district court struck down the TDC's "special handling" rules which permitted prison authorities to delay "disturbing" mail until a chaplain or psychologist could be notified. The district court found that this delay worked a severe hardship on prisoners. We think that its holdings in this respect are supported by the record.

**B. Attorney Mail**

■ The district court held that the TDC's proposed rules on attorney mail failed to satisfy the requirements of *Taylor v. Sterrett,* 532 F.2d 462 (5 Cir. 1976). TDC's proposed rule would have permitted the inspection of both incoming and outgoing mail for the presence of contraband and to determine that incoming correspondence was from a licensed attorney. The district court ruled that incoming mail would be opened and inspected for contraband in the presence of the inmate, that the inmate need not make a specific request for the

**5.** Indeed disrespectful comments hardly fall within the rule's ambit since "plans" are not necessary to the making of those comments, whether or not the comments themselves are against prison rules.

opening of mail in his presence, and that outgoing mail was required to be sent uninspected. It also held that the TDC could not require inmates to leave attorney mail in the writ room or in the hands of a TDC agent.

In *Taylor v. Sterrett, supra,* a panel of this court held that outgoing mail to licensed attorneys must be sent unopened and that incoming mail could be opened only to inspect for contraband and in the presence of the inmate recipient. The *Taylor* requirements derived from the nature of the correspondence involved. Because the inmates sought to communicate with attorneys rather than with the general public, the court found that inspection interfered with the prisoners' fourteenth amendment right of access to the court. Balancing the jail officials interest in security against that prisoners' right the court noted:

> In the first instance, we see no justification whatsoever for opening or reading correspondence addressed to the courts, prosecuting attorneys, parole or probation officers, and identifiable attorneys. The content of this outgoing mail cannot, except on the most speculative theory, damage the security interests of jail administration. *See Preston v. Cowan,* W.D.Ky.1973, 369 F.Supp. 14, 23; *Palmigiano v. Travisono,* 317 F.Supp. at 789. As a general proposition, it must be assumed that mail addressed to government offices or licensed attorneys containing contraband or information about illegal activities will be treated by the recipients in a manner that cannot cause harm. It is evident that mail addressed to supposed attorneys would pose a higher risk. Prison officials cannot assume that all outgoing correspondence designated by an inmate as addressed to an attorney is in fact directed to an individual admitted to the practice of law. They must, therefore, have the benefit of some uncomplicated technique for ascertaining the status of supposed attorneys. Requiring that prisoners wishing to correspond with an "identifiable attorney" present the name and business address of the attorney, perhaps by way of the sealed letter

itself, to prison officials 48 hours before that correspondence is to be placed in the mails is a procedure that obtains this result. Lists of licensed attorneys in the state and reference books containing attorneys admitted to practice in other states are readily available to ensure that only actual attorneys will receive this special correspondence. *See Guajardo v. McAdams,* 349 F.Supp. at 218. The threat to prison security arising from the mailing of unopened letters to identifiable attorneys is much more remote than if this category were any attorney-addressee.

At the same time, the use of this procedure and our suggested definition of identifiable attorney safeguard a prisoner's access to the courts. We have extended the protection of unopened, outgoing mail to any identifiable attorney either representing or being asked to represent a prisoner in relation to any criminal or civil problem. Although the prisoner's right of access to the court is most clearly connected to criminal matters and civil rights actions, the inherent likelihood that most prisoners will look, at least initially, to the same attorney for advice on all legal problems supports the inclusion of all civil matters.

532 F.2d at 473–74.

The TDC sought to distinguish *Taylor* factually on the ground that it involved a jail in which a small population of pre-trial detainees rather than a large population of convicted felons were housed. This distinction is not persuasive. The protection afforded extends only to attorneys representing or being asked to represent an inmate in either a criminal or civil matter. In that type of representation an attorney is also an officer of the court, bound by professional standards. An attorney who violated the TDC rules by forwarding mail, an offense which is unlikely given the new general correspondence rules, would face sanction under Tex.Rev.Civ.Stat.Ann. Art. 12, § 8, DR 7–102. Clearly an attorney involved in the smuggling of contraband into the prison or in an attempt to aid an inmate to escape

could be sanctioned by criminal law as well as by professional rules.

The same rules that apply to attorneys apply to government agencies and to courts. The greatest danger with respect to mail from government agencies or courts is that some person might place physical contraband in an envelope that purported to be from an agency or court. Prison authorities have adequate means to deal with that problem because they may open court and agency mail to inspect it for contraband. The danger to prison security, order and rehabilitation does not outweigh the right of access to the courts. This circuit has long recognized that right of access. *Frye v. Henderson,* 474 F.2d 1263 (5 Cir. 1973). As for outgoing mail, we are unwilling to believe that the courts and agencies will not control mail addressed to them. The greatest single danger in that respect, that agencies would be requested to forward mail, has been diffused by the new general correspondence requirements. Inmates who may correspond without prior approval and with an unlimited number of persons have no reason to seek surreptitious forwarding.

C. Media Mail

 The role of the press in exposing to public scrutiny the details of American government has provoked much recent debate and litigation. *See Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). But see *Houchins, Sheriff of Alameda County v. KQED,* —— U.S. ——, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). Plaintiffs in these cases asserted a right to send media mail unopened and to receive media mail that had been opened only for the inspection of contraband in the inmate's presence.

In agreeing that the plaintiffs' argument was correct, the district court relied again upon *Taylor v. Sterrett, supra,* and the right to petition for redress of grievance. We think that there is another reason for upholding the prisoners' contentions. In *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Supreme Court held that newspersons who enjoyed virtually unlimited correspondence rights with inmates could constitutionally be barred from conducting face-to-face interviews with inmates of their choice. *Id.* 94 S.Ct. at 2805. *See also Seattle-Tacoma Newspaper Guild, Local No. 82, of American Newspaper Guild v. Parker,* 480 F.2d 1062 (9 Cir. 1973). In *Pell* outgoing correspondence from inmates to press representatives was neither censored nor inspected. Incoming mail from press representatives was inspected only for contraband or statements inciting illegal action. Given the practical alternative of unrestricted correspondence between media representatives and inmates, the Court permitted prison officials to deny the face-to-face interviews with individual inmates. In this case we deal with the alternative that supported the *Pell* restriction.

An informed public depends upon accurate, effective reporting by news media. In refusing to block inmate-press correspondence and in protecting it from censorship we protect not only the interest of the inmates, but that of the public at large, and we move the decisions related to prison conditions out of the federal courthouse and into the public forum where they belong. *Nolan v. Fitzpatrick,* 451 F.2d 545 (1 Cir. 1971). We point out that the district court's decision does not permit wholesale sending and receiving of mail to any address purporting to be that of a media representative. The prison authorities may have a reasonable time, when necessary, to verify that the addressee reflected on the face of an envelope is actually a member of the editorial or reporting staff of a media organization. If TDC officials have reason to believe that a particular prisoner or media representative is using the mail to violate the law or threaten security, they may, upon a showing of probable cause, obtain a search warrant to read and open the mail. *See Taylor v. Sterrett, supra; Palmigiano v. Travisono,* 317 F.Supp. 776 (D.R.I.1970).

## D. Publications

### 1. Censorship

▇▇ The district court held that legitimate prison objectives were satisfied by a rule that permitted the censure of manuals providing step-by-step descriptions of the manufacture of weapons, explosives, or drugs and that these interests also justified censorship of publications judicially declared obscene. Although the district court framed its test in terms of security, order and rehabilitation, its ultimate rule is substantially akin to the "clear and present danger" test rejected by the Supreme Court in *Martinez, supra,* for the censorship of personal mail. There is also some question whether the *Martinez* rule is also applicable to the censorship of publications. *See Blue v. Hogan,* 553 F.2d 960, 963 n.4 (5 Cir. 1977).[6] The Court in *Martinez* stated that its rule was dependent upon the first amendment rights of persons wishing to engage in direct, personal correspondence with inmates rather than the first amendment rights of the inmates themselves. Later Court opinions have indicated, however, that prisoners do retain those first amendment rights that are not inconsistent with their status as a prisoner or with the legitimate penological objectives of the correctional system. *Pell v. Procunier, supra,* 94 S.Ct. at 2804. Challenges to prison restrictions that are asserted to inhibit first amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system. *Id.* We think that *Martinez* and *Pell,* taken together, establish a rule that prisoners retain those first amendment rights not inconsistent with prison security, order or rehabilitation. *Cf. Jones v. North Carolina Prisoner's Labor Union, supra.*

The record reveals that prison officials were concerned primarily with the censorship of two types of publications. First, they sought to ban material which they considered detrimental because of general advocacy of prisoners' rights. Second, they attempted to prohibit sexually oriented publications. While different considerations attend these two types of materials, we think that a unifying analysis is possible.

Typical of the material advocating "prisoners' rights" was "The Penal Digest International", published by the Fortune Society. Plaintiffs introduced an issue of that magazine into evidence. The lead story in the November-December 1971 issue was an open letter from women inmates in the Oklahoma State Penitentiary in McAlester. The unsigned letter was critical of the treatment of inmates following a dormitory disturbance. It also intimated that women inmates were not receiving adequate medical care. The magazine also featured a story about the National Prison Center, an inmate oriented group devoted to the correction of the corrections system, an analysis of a federal district court decision concerning prisons in Virginia, letters from inmates, and other material typical of a newspaper. Much of the inmate sponsored paper was devoted to criticism of prison administrators and penological theory. Indeed, its avowed motto is "Our life's mission is to be impatient—to push social progress a little faster than it is prepared to go".

▇▇ The testimony of prison officials revealed that their primary concern was with this criticism, which they considered inflammatory.[7] It also revealed that there

---

**6.** The court in *Blue v. Hogan* assumed without deciding that the *Martinez* standards were also applicable to publications. Other courts have agreed. *See Aikens v. Jenkins,* 534 F.2d 751 (7 Cir. 1976); *Morgan v. LaVallee,* 526 F.2d 221 (2 Cir. 1975); *McCleary v. Kelly,* 376 F.Supp. 1186 (M.D.Pa.1974); *The Luparar v. Stoneman,* 382 F.Supp. 495 (D.Vt.1974).

**7.** This court has traditionally viewed alleged inflammatory publications as a whole, *see*

*Walker v. Blackwell,* 411 F.2d 23 (5 Cir. 1969), and has sustained prisoners' requests to receive them when there was no direct incitement to physical violence. *Id.* at 29. At the same time we have cautioned that a demonstrated inflammatory effect might permit prison officials to withhold the publications. Significantly, in the present case Texas prison officials' complaints were never keyed to demonstrated incitement to physical violence. Rather the prison officials seemed to argue that

was merit to the prisoner plaintiff's contention that the TDC rules were vague and arbitrary. Dr. George Beto, the prison administrator at the time of the trial, testified that it was not the criticism which caused periodicals to be banned but their lack of *intelligent* criticism. [emphasis added].[8] His testimony also revealed that prison officials tended to lump all inmate magazines into the category of inflammatory and destructive. We think that testimony strikes at the heart of the first amendment. Certainly the responsibility of running one of America's largest prison systems is a burdensome one and prison officials must be allowed discretion in their day-to-day decisions. *Jones v. North Carolina Prisoner's Labor Union, supra.* That need for discretion does not, however, permit a policy that suppresses ideas failing to measure up to the official standard of intelligence.[9] Nor does the fact that a magazine is written by prisoners or exprisoners, standing alone, indicate that it is either inflammatory or destructive of the prison system. As the Court said in *Martinez*:

> The regulations invalidated by [the district] court authorized, *inter alia,* censorship of statements that "unduly complain" or "magnify grievances", expression of "inflammatory political, racial, religious or other views," and matter deemed "defamatory" or "otherwise inappropriate". These regulations fairly in-

vited prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship. Not surprisingly, some prison officials used the extraordinary latitude for discretion authorized by the regulations to suppress unwelcome criticism. 416 U.S. at 415, 94 S.Ct. at 1812.

We hold that TDC authorities may not censor publications on the ground that they contain criticism of prison authorities. *Procunier v. Martinez, supra*; *McCleary v. Kelly,* 376 F.Supp. 1186 (M.D.Pa.1974). They may censor portions of publications that contain information regarding the manufacture of explosives, weapons or drugs. They may also censor portions of publications that a reasonable person would construe as written solely for the purpose of communicating information designed to achieve the break down of prisons through inmate disruption such as strikes or riots. They may not censor inmate publications that advocate the legitimate use of prison grievance procedures or that urge prisoners to contact public representatives about prison conditions.

Dr. Beto also testified to the prison authorities' concern over material that they considered pornographic. The district court ruled that prison authorities could not ban sexually explicit magazines unless they had been judicially declared obscene. Adoption

---

the magazines' unintelligent criticism somehow barred repentance and therefore rehabilitation. We do not mean to suggest that prison authorities are subject to a clear and present danger test. *See Blue v. Hogan,* 553 F.2d 960 (1977). We do suggest that officials carry the burden of proving that a particular publication is substantially detrimental to official interest in security, order and rehabilitation and that on this record they have failed to carry the burden. *Blue v. Hogan, supra.* *See also Thibodeaux v. State of South Dakota,* 553 F.2d 558 (8 Cir. 1977).

8. [G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from

assembling or speaking on the basis of what they intend to say.

*Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), quoted in *Main Road v. Aytch,* 522 F.2d 1080 (3 Cir. 1975). In *Main Road,* a Philadelphia warden had banned a press conference with prisoners on the basis of its expected content. The Third Circuit ruled that even though prisoners might have no first amendment right to the conference, the warden could not permit some conferences and deny others unless denial was bottomed on a substantial government interest unrelated to the suppression of expression.

9. A public official may not constitutionally prohibit the exercise of first amendment rights according to his own conception of what may be the socially beneficial course. *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948).

of that rule would merely state a truism since the Supreme Court has categorically settled that obscenity is outside of the first amendment's protections. *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Other circuits have noted that prison officials may deny prisoners access to materials that are not obscene. *Aikens v. Jenkins*, 534 F.2d 751 (7 Cir. 1976). We think that such a rule is mandated by the prison environment. The first amendment rights of the prisoners cannot be evaluated without reference to that environment and to the type of audience it involves. *See Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); *Miller v. California, supra.* Prison officials testified that non-consensual homosexuality was a significant problem in Texas prisons. The State of Texas has seen fit to prohibit homosexual acts even between consenting adults. Moreover, the state does not and is not constitutionally required to permit prisoners conjugal visits. Thus for inmates stimulated by sexually explicit material the temptation to further criminal behavior looms large. We think it clear that a legitimate rehabilitation interest of prison authorities is involved in preventing homosexual acts. We are not willing to condone the introduction of material into the prison that would exacerbate the situation. On the other hand, we have just held that censorship may not proceed according to the whims of administrators. For that reason we set out the following guidelines.

Before delivery of a publication may be refused, prison administrators must review the particular issue of the publication in question and make a specific, factual determination that the publication is detrimental to prisoner rehabilitation because it would encourage deviate, criminal sexual behav-

ior. *See Thibodeaux v. State of South Dakota*, 553 F.2d 558 (8 Cir. 1977); *Carpenter v. South Dakota*, 536 F.2d 759 (8 Cir. 1976), *cert. denied*, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977); *Morgan v. LaVallee*, 526 F.2d 221 (2 Cir. 1975). Prisoners must, of course, be allowed to appeal that decision through proper administrative channels.[10]

### 2. Publishers Only Rule

■ The district court upheld the publishers only rule which allows inmates to receive publications only from a publisher or a publications supplier. Publications suppliers include bookstores. We agree with the district court that the security risk created by permitting inmates to receive books from friends or relatives supports this rule. We also agree that with respect to legal material the defendant institution's willingness to include bookstores as publications suppliers and the prison law library sufficiently alleviate any infringement on the right of access to the court.

### E. Packages

■ The district court found that the potential security risk from packages is substantial and that problems of inspection are severe. It held that while the rule which prohibited friends and relatives from sending packages placed indigent inmates at some disadvantage, it was not so arbitrary or discriminatory to implicate equal protection. We agree.

### F. Postage

■ The distinct court held that the TDC must furnish postage and stationery to indigent inmates for special correspondence, attorney correspondence and for five additional letters a week without regard to any waiting period but could recoup amounts expended during the first sixty days an inmate is indigent from funds later deposited in the inmate's Trust Fund Account.

---

10. Prisoners must be given notification of the refusal. *Woods v. Daggett*, 541 F.2d 237, 240 (10 Cir. 1976); *Hopkins v. Collins*, 548 F.2d 503 (4 Cir. 1977). An inmate receives sufficient review of the administration's decision not to permit the magazine if he receives (1) appropriate notice, (2) a reasonable opportunity to challenge the initial decision, and (3) an ultimate decision by a disinterested party not privy to the initial censorship decision. *Id.*

We agree with the district court that this preserves both the indigent inmate's right to access to the courts and his right to communicate with the media at minimal expense and inconvenience to the TDC.

### III. Attorneys' Fees

 The district court after careful consideration of the factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5 Cir. 1974), awarded substantial attorneys' fees to the plaintiffs. We held this case in abeyance pending the Supreme Court's determination whether the eleventh amendment barred the award of attorney fees in the present situation. Their recent decision in *Hutto v. Finney*, —— U.S. ——, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), makes clear that the eleventh amendment is no bar, a decision reached earlier by this court in *Gates v. Collier*, 559 F.2d 241 (5 Cir. 1977). Absent the eleventh amendment question, the state's sole argument is that the fees are excessive since plaintiffs were not truly "prevailing parties" as long as the case looked to be settled. We find no merit in that reasoning and we rule that the district court's award is not reversible.

In summary, we hold that no three-judge court or jury trial were required, that the district court's rulings with respect to general correspondence are affirmed except that the rulings on the two specific correspondence rules numbers 3.9.1.9(e) and 3.9.1.9(i) are reversed, that the district court's rules with respect to attorney and media mail are affirmed, that the district court was correct in its censorship rules except insofar as it permitted censorship only of sexually explicit material judicially declared obscene, that the publishers only rule is valid, that the rule on packages is valid and that the postage rules withstand scrutiny.

Accordingly, the case is AFFIRMED IN PART and REVERSED IN PART.