Amos NICHOLSON et al., Plaintiffs,

v.

CHOCTAW COUNTY, ALABAMA et al., Defendants.

Civ.A.No. 78–407–P.

United States District Court,
S. D. Alabama, S. D,

June 30, 1980.

Clarification of Opinion and Order
Aug. 21, 1980.

As Amended Sept. 25, 1980.

Booker T. Forte, Jr., Legal Service Corp. of Ala., Selma, Ala., Abigail Turner, Legal Services Corp. of Ala., Mobile, Ala., for plaintiffs.

Wallace H. Lindsey, III, Butler, Ala., Jack Curtis, Asst. Atty. Gen., State of Ala., Montgomery, Ala., Wm. Scears Barnes, Jr., Alexander City, Ala., for defendants.

## OPINION AND ORDER

PITTMAN, Chief Judge.

This cause is brought by Amos Nicholson and others, on behalf of themselves and all inmates presently incarcerated in the Choctaw County Jail, and all persons who will be incarcerated therein in the future. The defendants are Choctaw County, Alabama; Donald Lolley, individually and as Sheriff of Choctaw County, Alabama; Charles V. Ford, individually and as Probate Judge of Choctaw County, Alabama; E. C. Arrington, Julian Johnson, Grady Mosley, and Oliver Sealy, individually and as Commissioner of Choctaw County, Alabama; and Robert Britton, the Commissioner of the Department of Corrections of the State of Alabama.

1. The plaintiffs' first cause of action against the defendants is based on claims of unconstitutional treatment in violation of the First Amendment to the United States Constitution in censorship of mail and reading materials and in denial of the right freely to exercise their religion.

2. The plaintiffs' second cause of action against the named defendants in their individual and official capacities arises under the Sixth Amendment to the Constitution of the United States in that the plaintiffs are prohibited from effectively preparing for trial or post–trial hearings because of restrictions on visitation and correspondence; the plaintiffs are unable to exercise their constitutional right to represent themselves or to assist in their representation because the jail does not provide legal textbooks or a law library, and the plaintiffs are impeded from assisting in trial or post–trial proceedings because they are denied access to the telephone.

3. The plaintiffs' third cause of action against the named defendants arises under the Eighth and Fourteenth Amendments to the Constitution and includes violations of their right to be free of cruel and unusual punishment, including the right to adequate medical and dental treatment, the right to items of personal hygiene, the right to a nutritionally adequate diet, the right to physical facilities which are healthy, the right to a classification system, the right to adequate recreation, the right to education and rehabilitation opportunities, the right to be protected by adequate jail personnel, and the right to regular visitation with friends and loved ones.

4. The plaintiffs' fourth cause of action against defendants arises under the Fifth and Fourteenth Amendments to the United States Constitution in that plaintiffs are denied due process in disciplinary actions.

5. The plaintiffs' fifth cause of action against Sheriff Donald Lolley and the Choctaw County Commission arises under Alabama Code § 14–6–19, which guarantees to prisoners adequate medical services.

6. The plaintiffs' sixth cause of action against Sheriff Donald Lolley arises under Alabama Code § 14–6–21 and § 14–6–95, which require the Sheriff to keep the jail in a clean manner.

7. The plaintiffs' seventh cause of action against Sheriff Donald Lolley arises under Alabama Code § 14–6–40 and § 14–6–97, and the Commissioner of the Department of

Corrections under § 14–6–41, which require the provision of nutritionally adequate food to prisoners.

8. The plaintiffs' eighth cause of action against Sheriff Donald Lolley and the Board of Corrections arises under Alabama Code § 14–6–96 and § 14–3–41, which require the sheriff to fumigate the jail periodically and to remove the prisoners found to have contagious diseases.

9. The plaintiffs' ninth cause of action against Sheriff Donald Lolley arises under Alabama Code § 14–6–105, which requires the sheriff to provide an adequate number of watchmen to insure security in the jail.

10. The plaintiffs' tenth cause of action against the Choctaw County Commission arises under Alabama Code § 14–6–20, which requires the County Commission to provide adequate medical care for county prisoners.

11. The plaintiffs' eleventh cause of action against the Choctaw County Commission arises under Alabama Code § 14–6–41(b), which requires the County Commission to provide nutritionally adequate food for prisoners.

12. The plaintiffs' twelfth cause of action against the Choctaw County Commission arises under Alabama Code § 14–6–92, which requires the County Commission to fumigate the jail and keep it in a clean manner.

13. The plaintiffs' thirteenth cause of action against Choctaw County Commission arises under Alabama Code § 14–6–93, which requires the County Commission to provide sufficient bathing facilities for prisoners.

14. The plaintiffs' fourteenth cause of action against the Choctaw County Commission arises under Alabama Code § 14–6–103, which requires the County Commission to provide sufficient jail space to hold prisoners in healthful and sanitary facilities.

15. The plaintiffs' fifteenth cause of action against the Choctaw County Commission arises under Alabama Code § 14–6–105, which requires the County Commission to house prisoners in a jail with a sufficient number of watchmen to guarantee security.

This cause was tried before this court without a jury with members of the plaintiff class, the defendants, and attorneys for all parties present. Evidence was taken, an opportunity for argument given, and the case was taken under submission.

The plaintiff class consists of all inmates presently incarcerated in the Choctaw County Jail, and all persons who will be incarcerated therein in the future. Joinder of all members of the class is impracticable. There are questions of law and of fact common to the class, and the claims of the named plaintiffs are typical of those of the class. The named plaintiffs have fairly and adequately protected the interests of the class. The defendants have acted and have refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

## FINDINGS OF FACT

### AGREED FACTS

Donald Lolley is the Sheriff of Choctaw County, Alabama, and under the laws of the State of Alabama is the person responsible for the administration, operation and maintenance of the county jail. Charles V. Ford is the Probate Judge of Choctaw County, Alabama, Chairman ex–officio of the Choctaw County Commission. The Commission is composed of four commissioners, who are: Grady Mosley, E. C. Arrington, Oliver Sealy, and Julian Johnson. This body has the statutory responsibility for funding the administration, maintenance and operation of the Choctaw County Jail.

The Commissioner of the Department of Corrections of the State of Alabama has been substituted, with the consent of the State, for the now abolished Board of Corrections.

### HEALTH CARE

There are no medical facilities at the jail other than medicine prescribed by doctors

for the inmates, and a first aid kit. There is no sick bay. No medical personnel have been to the jail since September 20, 1979, in violation of the preliminary injunction order. The sheriff's effort to obtain medical personnel in compliance with the court order was to ask the Probate Judge and County Commission to get a Registered Nurse or a Licensed Practical Nurse to come to the jail. The Probate Judge and the County Commission have not hired medical personnel to go to the jail. The County Commission has appropriated no funds to hire medical personnel.

There is no medical screening or examination given to a person when he is committed to the jail, nor is there a physical examination given after the person has been in jail for several months or more. At no time since Donald Lolley became sheriff on January 20, 1975, has the Choctaw County Health Department or any other medical personnel regularly examined each person admitted to the Choctaw County Jail for venereal disease or any other contagious disease.

The jail has instituted a system of record keeping for medical requests pursuant to the preliminary injunction order of September 20, 1978. The form fails to include information for an inmate to indicate the date of his or her request for medical treatment. The doctor attending the patient makes the entries concerning the condition the inmate is treated for and the type of medication. These entries are often illegible to jail personnel and are not written in language that jail personnel, who need to attend to the health needs of inmates, can understand.

A system of record keeping for dispensing drugs has been instituted since the court order of September 20, 1978. There is, however, no record kept on the quantity of medicine as set out on the label of drugs provided for each inmate.

Trusties continue to distribute drugs to inmates in violation of the preliminary injunction order. Trusties serve as jailers because of the inadequate number of jailers hired by the County. From late January 1979 through the date of these agreed upon facts, July 13, 1979, a trusty had been serving two eight hour shifts each day in the absence of one or more jailers.

The sheriff or a deputy decides when an inmate will be taken to the doctor. The doctor has given neither the sheriff, nor the deputies, nor the jailers any orders about when the doctor should be called or when an inmate should be taken to the doctor. None of the jailers has had first aid training since employed by the Sheriff or Choctaw County.

Although medical records are now kept in a locked file cabinet, to carry out the duties of the jailer in administering medicine, inmate trusties have access to the medical records of other inmates in order to make the proper entries on the drug distribution records.

The following indicates the type of drugs administered to various inmates since September 20, 1978:

*Drug*

Lasix 20 mg. tablets
Robinycin
Erythrocin
Valium 5 mg. tab
Nembutal 50 mg.
Librium 10 mg.
Mellaril 50 mg.
Diupres
Grifulvin "V" 500 mg.
Sumycin 250 mg.
Dimetapp Ext
Empirin
Theragran
Syr. Hycodan IV
Vasodilan 20 mg.
MegGram
Ethril 250 mg.
Dolere–AP–65
Dilatin Sol. 100 mg.
Principen "250" capsules
Ru–Vert Tab

On October 27, 1976, Jere Levon Chatom was admitted to the Choctaw General Hos-

pital from the Choctaw County Jail. At that time, the sheriff was informed that Mr. Chatom had active tuberculosis. Not until December 6, 1976, did Sheriff Lolley request the Choctaw County Health Department to test the jail population for tuberculosis.

On December 6, 1976, Mrs. Helen Daniels, a Registered Nurse with the Choctaw County Health Department, administered skin tests to twenty–six persons in the jail, including some jail employees. These persons were tested with purified protein derivative (PPD) given intradermally. The skin tests revealed that 13 persons were identified as positive reactors on December 16, 1976. These persons were started on chemotherapy of one tablet of Isanide (INH) daily.

On February 14, 1977, 10 of the positive reactors were x–rayed by the Choctaw County Health Department. Henry Koen's x–ray indicated he had pulmonary fibrosis. Clifton Lancaster's x–ray indicated he had active TB.

Despite Mr. Lancaster's being diagnosed as having active tuberculosis, the Health Department did not return to test inmates until March 9, 1977, at the request of State Health Department officials. Four of forty–five persons skin tested on March 9 were identified as positive reactors. These persons were prescribed INH. On March 9, 1977, Clifton Lancaster, Jr. was admitted to the University of South Alabama Medical Center from Choctaw County Jail. At that time, the Sheriff was informed that Mr. Lancaster had pulmonary tuberculosis. Mr. Lancaster returned to the Choctaw County Jail on March 15, 1977, and remained there until June 23, 1977. Mr. Lancaster was not segregated from other inmates upon his return to the jail on March 15, 1977. No further skin testing of Choctaw County Jail inmates has been conducted.

It is the policy of the Choctaw County Commission and the Sheriff's Department to provide no preventive dental care for inmates nor to fill teeth. The only dental care that has been provided for decayed teeth is extraction as indicated by dental care records.

Many persons are committed to Choctaw County Jail who are intoxicated or have been charged with an offense involving excessive use of alcohol or drugs. Such persons are generally placed in the day room or on the west side of the top floor, along with other inmates. If an inmate is extremely intoxicated he may be isolated. There have been 39 admissions of intoxicated persons from March 1976 through November 5, 1978, for, to wit, driving while intoxicated, highway intoxication, and public drunkenness.

Neither the sheriff, nor the deputies, nor the jailer, nor the inmate trusties have been formally trained to detect mental illness or to handle mentally ill persons, despite the fact that mentally ill persons are often committed to Choctaw County Jail. There have been at least 23 persons who were incarcerated in the Choctaw County Jail who were transferred to a mental hospital or referred to West Alabama Mental Health from Choctaw County Jail after being charged with a crime.

Any on–the–job training that is provided to personnel in the handling of intoxicated or mentally ill persons, or in detecting mental illness, is done by the sheriff or the deputies, none of whom has been formally trained to handle these types of illnesses.

## FIRE SAFETY

The May 16, 1977, inspection of the Choctaw County Jail by the Deputy State Fire Marshal John W. Hammac stated that the lack of a fire escape from the second floor "poses a serious hazard to the safety of inmates housed there and should be corrected immediately by providing a second means of egress from that area." The October 25, 1977, inspection of Mr. Hammac found that the fire escape deficiency still existed and had not been corrected. In the Board of Corrections Jail Inspection Report of November 1, 1977, Paul R. Sides, Inspector, stated that a fire exit should be provided from the second floor. No fire escape from the second floor of the jail has been

constructed. There have been no plans drawn nor any cost estimates of constructing a fire escape from the second floor.

The May 17, 1977, report of the Deputy State Fire Marshal John W. Hammac ordered that smoke detectors and a fire alarm system should be provided so that an alarm could be sounded in case of fire. Mr. Hammac's October 25, 1977, report noted that this deficiency still existed and had not been corrected. The Jail Inspection Report of the State Board of Corrections prepared by Paul R. Sides, Inspector, on April 19, 1978, noted that there were no smoke detectors or a public address system for notification of inmates and personnel during a fire emergency. Mr. Sides' report of September 13, 1978, again ordered that smoke detectors should be installed. Not until December 28, 1978, were smoke detectors purchased for the jail. They were installed sometime after that date.

A written comprehensive fire evacuation plan was ordered in the March 17, 1977, report of Deputy State Fire Marshal John W. Hammac. No such plan had been written and drawn on October 25, 1977, when Mr. Hammac again inspected the jail. The Board of Corrections Jail Inspection Report of April 19, 1978, prepared by Paul R. Sides found that there was no emergency evacuation plan. On September 20, 1978, the defendants agreed to develop a written fire evacuation plan. The written fire evacuation plan consists solely of a diagram of the jail with arrows drawn on it. There are no written instructions which accompany this plan to explain to an inmate where he or she should exit from the jail in case of fire.

The absence of fire extinguishers on the second floor west side in the female section and the male section of the second floor on the east side presented a fire hazard according to the State Board of Corrections Jail Inspection Report of April 19, 1978. Fire extinguishers have not been installed in these areas.

The State Fire Marshal informed Sheriff Lolley on March 2, 1977, that most of the mattresses in the cells contained polyurethane mattress pads which did not conform to the State Fire Code. The Fire Marshal ordered that these mattresses were to be removed and replaced. Again on May 16, 1977, Deputy State Fire Marshal John W. Hammac ordered that the polyurethane mattresses be replaced. On October 25, 1977, John W. Hammac again found that only twelve of the 52 polyurethane mattresses had been replaced. In the preliminary injunction order of September 20, 1978, the defendants agreed to replace the mattresses with those conforming to State Fire Codes. On October 9, 1978, twelve mattresses were ordered and on October 20, 1978, 28 mattresses were ordered to conform to the state fire code.

All locking devices at the Choctaw County Jail must be manually unlocked. In case of a fire, to let prisoners out of the cells on the west side of the top floor, two locking devices must be unlocked with separate keys. The four cells on the west side may be unlocked by passing through the two key–system devices and then releasing four levers and rolling the doors open. Prisoners held on the top floor of the jail must go down the steps located on the south side of the top floor to the first floor and walk approximately fifteen feet toward the center of the jail structure, turn right, and walk approximately fifteen feet to exit out the front door of the jail.

For male prisoners to exit from the east side of the top floor of the jail in the event of a fire, a jailer or trusty must unlock the two locking devices on the east side of the top floor with separate keys. The two cells on the southeast side may be unlocked after passing through the two key–system devices and then releasing two levers and rolling the doors open. Prisoners housed on the east side of the top floor must walk approximately 25 feet back to the steps in the south center of the top floor, walk down the steps, walk fifteen feet to the center of the jail and approximately fifteen feet to exit out the front door of the jail.

In the event of a fire, to let female inmates out of their cells on the southeast side of the top floor, it is necessary to unlock the two locking devices which must be unlocked with keys and then to unlock each of the two cells separately. Female

inmates must walk approximately twenty feet to the stairs on the south side of the jail, walk down the stairs, walk fifteen feet to the center of the jail and fifteen feet to exit out the front door.

In a fire emergency, for inmates on the east side of the ground floor to leave the jail, a door must be unlocked with a key and then each cell must be unlocked with another separate key. Similarly, for inmates on the west side of the ground floor to exit, a door must be unlocked with a key and then each cell must be unlocked with a separate key.

In the fall of 1978, when Jerry Dale Todd and Willie James Thomas were held at the jail, their cells were further locked by a logging chain and a padlock. Thus, in the event of fire, that additional lock would have had to have been unlocked.

All inmates housed on the top floor of the jail, which may number as many as 36 persons, must exit down the steps on the south side of the jail. These steps are only 42 inches wide. This is the sole entrance and exit to the second floor. According to the fire escape plan, all inmates housed on the first floor, who may number 14 or more, are to exit out the kitchen. When the inmates from the second floor come down the stairs to the first floor, they must pass through a hall which will also be the passage for the inmates exiting out the kitchen. Thus the total jail population must pass through the corridor between the kitchen and the front part of the jail in order to exit in case of fire or other emergency. If the fire occurs in the kitchen all inmates would have to exit out the front door.

Sheriff Lolley has requested the County Commission to provide funds to construct a fire escape from the second floor of the jail. The County Commission has refused to provide funds for this purpose.

TRUSTY SYSTEM

In the Jail Inspection Report of the State Board of Corrections of November 1, 1977, Paul R. Sides, Inspector, noted that there were an inadequate number of persons employed at the jail to provide adequate security. He further noted: "Trusties are also allowed to carry keys which causes a security risk and should be stopped." The practice of using trusties was again ordered stopped by the Board of Corrections Jail Inspection Report of April 19, 1978. In that report Paul R. Sides, Inspector, stated, "[W]hen a jailer is out a trusty serves as jailer. At time of inspection a trusty was serving as jailer." Despite these reports, trusties continue to perform the jobs of a jailer when the jailer is on leave.

As of March 23, 1979, jailer Joseph G. Campbell had been on sick leave for six weeks. Inmate trusty Tony Ward has served as the jailer in Mr. Campbell's place. Inmate trusty Tony Ward has also served as jailer on another shift during this same period since Charlie Ezell, Jr. terminated his employment in January 1979. Thus inmate trusty Tony Ward serves as jailer sixteen hours per day. Inmate trusties who are serving as jailer have the duties and responsibilities for the overall running of the jail. These duties include:

(a) communicating by radio and telephone with the deputies' cars across the county;

(b) receiving, handling and dispatching complaints by radio to the deputies across the county from 5:00 p. m. to 8:00 a. m.;

(c) handling other telephone calls to the jail;

(d) custody of the keys; and

(e) hourly patrol of the cells.

As of March 23, 1979, the two trusties at Choctaw County Jail were Tony Ward and Howard Carter. Inmate trusty Tony Ward had been convicted of first degree murder and sentenced to life. Inmate trusty Howard Carter had been convicted of burglary and sentenced to two years. Inmate trusty privileges include:

1. Use of the telephone

2. Residence in an unlocked cell

3. Leaving the jail on permission of the sheriff or a deputy for such things as going to the store or feeding the dogs.

## RECREATION

Prisoners are confined to their cells 24 hours a day. There is no organized recreation for prisoners when they are in their cells.

Adjacent to the jail and immediately behind it is a large area which could be fenced in and used for a recreation area for the jail. The estimated cost to fence the area is $14,000–$15,000.

## NUTRITIONALLY ADEQUATE FOOD

Inspection reports by the Choctaw County Health Department noted deficiencies in the hygienic practices of the food handlers on the following dates: August 29, 1978; June 12, 1978; May 5, 1978; February 17, 1978; November 8, 1977; August 11, 1977; July 21, 1977; May 31, 1977; April 14, 1977; October 5, 1976; and May 31, 1976.

The only rules that the sheriff imposes on the cooks in the jail are those set forth in his list of RULES AND REGULATIONS FOR ALL COOKS. There was no rule as of March 23, 1979, requiring all free world personnel who serve as cooks or all inmate cooks to be tested by the Health Department prior to their work in the kitchen and on a regular basis, no less than quarterly, for contagious diseases including tuberculosis and venereal disease.

Ms. Carrie Turner is employed as a cook for the jail through the CETA program. Ms. Turner has no training in nutrition. The menus for the meals at the jail are prepared by Sheriff Lolley. Sheriff Lolley has no formal training in nutrition and consults with no person who has training in nutrition in preparation of the menus.

Inspection reports by the Choctaw County Health Department for the dates listed noted deficiencies in that food was being served from an unapproved source including wild game, such as deer: February 17, 1978; March 1977; December 1976; and May 31, 1976. Despite the deficiencies noted in the Health Department report, the jail continues to serve inmates uninspected beef which has been slaughtered by inmates from cows killed on the highway and uninspected deer killed in hunting accidents or killed on the highway.

## DISCIPLINE

The sheriff revised the disciplinary rules pursuant to the preliminary injunction order of September 20, 1978, by abolishing the rules. The inmates are still given a set of the abolished disciplinary rules, but are not told that the rules no longer apply.

Certain actions listed below will often lead to an inmate being moved to another cell or to a cell by himself:

1. Inmates fight among themselves;
2. Inmate punches out another inmate;
3. Inmate punches out a guard;
4. For his own protection, inmate is segregated from other inmates.

When a person is moved to another cell or to a cell by himself, he is not allowed to state his position or to have a hearing which complies with the preliminary injunction order of September 20, 1978.

## VISITATION

Visiting hours are Monday and Thursday from 2:00–4:00 p. m. Visits are not held in private, but take place with the visitor talking to the inmate through the bars. Thus, an inmate can kiss or embrace a visitor only if he does so through the bars.

The sheriff determines whether an inmate is allowed to leave the jail to attend a funeral or to visit a sick relative.

## JAIL FACILITIES

The design capacity for each cell in the jail is as follows:

| Cell Location | Square Feet | Number Persons | Square Feet Per Person |
|---|---|---|---|
| Ground floor | | | |
| S/E | 112 | 4 | 28 |
| N/E | 112 | 4 | 28 |
| S/W | 133.7 | 6 | 22.3 |
| N/W–Hole | 133.7 | | |
| Top floor | | | |
| Female S/E | 80 | 2 | 40 |
| Female N/E | 80 | 2 | 40 |
| Male N/E–S (day room) | 186.3 | 2 | 93.2 |
| Male N/E–N | 122.6 | 8 | 15.3 |
| S/W (day room) | 104.5 | 2 | 52.3 |
| N/W central (1) | 122.6 | 4 | 30.6 |
| N/W central (2) | 122.6 | 8 | 15.3 |
| N/W–N | 122.6 | 8 | 15.3 |

The only cells containing picnic tables for the inmates to eat on are the day rooms on the top floor. In all other cells, inmates must eat on their bunks or on the floor.

Cells with showers are as follows:

| Cell Location | Shower |
| --- | --- |
| Ground floor | |
| S/E | Yes |
| N/E | Yes |
| S/W | Yes |
| N/W–Hole | No |

| Cell Location | Shower |
| --- | --- |
| Top floor | |
| Female S/E | Yes |
| Female N/E | Yes |
| Male N/E–S (day room) | Yes |
| Male N/E–N | No |
| S/W (day room) | Yes |
| N/W central (1) | No |
| N/W central (2) | No |
| N/W–N | No |

## BUDGETS
### EXPENDITURES AND BUDGET
### CHOCTAW COUNTY JAIL
### FISCAL YEAR 1977
### FISCAL YEAR 1978
### FISCAL YEAR 1979

| | FY77 | FY78 | FY79 | % Change 78–79 |
| --- | --- | --- | --- | --- |
| Maintenance and repairs | $ 5,385 | $ 6,578 | $10,000 | + 52% |
| Lights, heat and water | $ 6,350 | $ 7,430 | $ 8,000 | + 8% |
| Doctors and medicines | $ 5,910 | $ 3,575 | $ 6,000 | + 68% (Paid by State) |
| Supplies | $ 3,278 | $ 3,313 | $ 3,000 | – 10% |
| Clothing and bedding | $ 712 | $ 284 | $ 4,500 | + 1485% |
| Telephone | $ 665 | $ 399 | $ 500 | + 101% |
| Equipment | $ 415 | – | $ 400 | – |
| Salaries – Watchmen (Jailer) | $ 7,075 | $ 4,923 | $15,000 | + 207% (Paid from CETA) |
| Miscellaneous | – | – | $ 100 | – |
| Total | $29,790 | $26,502 | $47,500 | |
| Liability Insurance – | | $15,988 | $16,751 | |

Although the Choctaw County Jail budget for fiscal year 1979, October 1, 1978 to September 30, 1979, is shown to be $47,500, the County does not provide from tax revenues all these funds. Liability insurance for the jail is an additional cost of $16,751, the largest cost to the jail. The cost of food is not shown; however, this is paid by reimbursement from the State of Alabama pursuant to Alabama Code § 14–6–42. Although doctors and medicines are estimated to cost $6,000, the State will reimburse most of this expense. Because all jailers are CETA employees, whose salaries are paid by United States Department of Labor funds, the County has to date in this fiscal year spent no money on jailers.

Most of the budget items show an increase for FY1979. To date most of this money remains unspent, however, and could be obligated for improvements to the jail.

The County anticipated revenue from General Revenue Sharing for fiscal year 1979 at $224,055. The expenditure of these funds is basically left to the discretion of the County Commission.

## PRETRIAL DETAINEES

Persons held at the Choctaw County Jail pending trial are treated no differently than convicted persons.

The status of the following persons held at the Choctaw County Jail on March 23, 1979, is as follows:

| Name | Pretrial Detainee | Convicted |
|------|-------------------|-----------|
| Howard Carter | | X |
| Jerry Causey | X | |
| Elston Everette | X | |
| Ozie Groom | X | |
| Roy Moss | | X |
| Milton Motunda | | X |
| James Scarbrough | X | |
| Tony Randall Ward | | X |

## RELIGIOUS SERVICES

Inmates are not allowed to attend religious services outside the jail. The only religious guidance provided to plaintiffs and other inmates is provided on a sporadic basis by laymen and/or ministers who may come to the jail of their own volition or at the request of an inmate. In addition, plaintiffs and other inmates are not consulted about their religious needs by Sheriff's Department personnel.

## LEGAL MATERIALS

The jail does not have a facility for housing legal materials, nor does the jail have legal textbooks, case law books, statutory materials, a writing room, a notary public, or typewriters to assist inmates in the preparation of their pretrial or post-trial proceedings.

## BATHING FACILITIES

There are four cells on the second floor of the jail without showers. There is one cell on the first floor of the jail without a shower.

## CLASSIFICATION OF INMATES

There is not a classification system at the jail. With the exception of juveniles and females, pretrial detainees, misdemeanants, and persons being held on mental illness charges are housed with inmates convicted of felonies. In addition, pretrial detainees are not treated differently from convicted detainees.

## JAIL STAFF

The only training the staff of the jail has had is on-the-job training. They have not had any formal training of any kind.

Alabama Code § 14-6-81 requires the Board of Corrections to inspect county jails twice per year and to aid in securing the just, humane and economic management of persons confined in county jails. The investigation division of the Board of Corrections inspected the Choctaw County Jail on the following dates and found the stated number of state prisoners housed therein:

| Date | Number of State Prisoners |
|------|---------------------------|
| May 20, 1976 | 25 |
| June 1, 1977 | 43 |
| November 1, 1977 | 45 |
| April 19, 1978 | 38 |
| September 13, 1978 | 14 |

Reports by the Board of Corrections investigation division revealed the following reported deficiencies, among others, on the date of inspection.

| Deficiency | Date of Inspection |
|------------|--------------------|
| Inadequate number of employees to secure jail and protect inmates | 6/1/77 |
| Trustees used to supplement personnel | 5/20/76 |
| Inmate trustees have access to keys | 6/1/77 |
| No recreation allowed | 5/20/76 |
| Kitchen too small for size facility | 4/19/78 |
| No emergency fire evacuation plan | 6/1/77 |
| Fire exit needed from second floor | 11/1/77 |
| Not have fireproof mattresses throughout | 11/1/77 |
| Additional fire extinguishers needed | 11/1/77 |
| Smoke detectors need to be installed | 4/19/79 |
| Exposed electrical wiring in cells | 6/1/77 |
| Plumbing poor including commodes, lavatories and showers | 4/19/78 |
| No fumigation program to comply with Alabama Code Title 45, Section 171. | |

Although the Commissioner of the Department of Corrections knew of the deficiencies enumerated in paragraphs 2 through 35 of the plaintiffs' proposed findings of fact in the Choctaw County Jail as a result of his statutory inspections under Alabama Code § 14-6-81, he took no action to enforce his orders that the facilities be brought up to meet minimum standards.

The Commissioner of the Department of Corrections knew or should have known of the unsanitary conditions found by the Choctaw County Health Department at the Choctaw County Jail as a result of his statutory inspections. The Commissioner took no action to insure correction of such deficiencies, but took the position that he had no duty for proper maintenance of the jail beyond inspection.

State inmates housed at Choctaw County Jail numbered from as many as 45 in November 1977 to 14 in September 1978, and thus these inmates contributed significantly to the over–crowded conditions and excessive demands on the facilities at Choctaw County Jail.

LENGTH OF INCARCERATION
OF
PERSONS HELD THREE OR MORE DAYS
IN
CHOCTAW COUNTY JAIL
January 1, 1976 – February 28, 1979

|  | Number | Percent |
| --- | --- | --- |
| Less than 30 days | 196 | 60 |
| 30–90 days | 45 | 14 |
| 91–180 days | 29 | 9 |
| 181–270 days | 21 | 6 |
| 271–365 days | 12 | 4 |
| Over 1 year | 26 | 8 |
| Total | 329 | 100 |

## BY THE COURT

The Choctaw County Jail was built in 1964, and was designed to house 52 inmates. The maximum number of inmates are hereinafter set out.

The overcrowding at the jail in 1977 was a result of federal court orders concerning the conditions in the state prison system. As a result of those orders the state transferred some of its inmates to county jails, including the Choctaw County Jail. This condition ended several months ago, and the jail population presently runs around 11 or 12 inmates. Because the jail population is presently, and is expected to continue to be well below its maximum capacity of 40, the prescription of a minimum square footage per inmate is unnecessary for the protection of inmates. The number of inmates shown to have been held over one year from 1976 to February 1979, to wit, 26, will be drastically reduced for this reason. Some of the state prisoners must have been incarcerated for less than one year since the number ranged from 14 to 45.

The sheriff testified, and the court finds, that one extra guard or jailer will be necessary when the jail population reaches 30, and that a second extra guard or jailer will be necessary when the jail population reaches the maximum of 40.

The State Fire Marshal has recommended that an outside fire escape be constructed for the second story of the jail. The agreed facts show that inmates from the second story cells might be required to exit through the jail kitchen in several situations. It is common experience that fires often start in kitchens. The lack of an outside fire escape constitutes a significant threat to the lives of inmates in the event of a fire.

The sheriff's ability freely to transfer inmates among the various cells is necessary for the orderly administration of the jail and the preservation of jail security. With the exception of "the hole," (also known as punitive isolation) the differences in conditions among the cells are negligible.

Auxiliary locking devices are sometimes used on the jail doors. There is no evidence that these devices unnecessarily endanger the lives of inmates. Absent such a showing, the sheriff must be free to determine how cells and hallways are to be secured.

The formal staffing with medical personnel proposed by the plaintiffs is not necessary to preserve the health of inmates. The jail serves a small rural county with a population of 16,589 persons (1970 Census). It is located in a small town. The jail population is small; the jail itself is close to doc-

tors' offices and within a mile of the local hospital. Inmates will be able to receive adequate medical care by requesting attention when their problems arise.

The jail personnel's lack of training in emergency health techniques constitutes a danger to the health of inmates. Jail personnel *must* be trained in basic emergency techniques, so they can respond to a situation which could result in death before a doctor or nurse could arrive. They should be trained in basic health care techniques so that they can provide routine medical care. The evidence shows that such training is available in the community.

The plaintiffs have requested that this court order the state prison system to test for tuberculosis certain inmates when they are transferred from the Choctaw County Jail to a state institution. The state prison system is not a subject of this action, and this court will not enter an order which directly affects it. It is necessary to protect the health of such an inmate, however, that county jail personnel inform the appropriate state authorities that he has been identified as a positive reactor.

The use as food for inmates of deer and other wild game which has been killed by automobiles or trucks on the highway poses a threat to the inmates' health. Butchering of meat by persons without adequate previous experience in the tasks required of them also poses a threat to the inmates' health.

Opening, inspecting, or withholding outgoing mail to persons other than attorneys, courts, or government agencies may in some cases be reasonably necessary for the preservation of jail security.

The plaintiffs have requested that this court order the inner doors in the cells on the second floor, east side, to be unlocked so that inmates may shower whenever they wish. Inmates have already ample opportunity to shower, without this measure. Further, requiring inner doors to be unlocked would cause a substantial threat to jail security.

There is no evidence that the present telephone facilities are inadequate to provide inmates with reasonable use of the telephone.

The plaintiffs have requested that a state pretrial detainee be transferred to a state institution upon his or the sheriff's request, for the protection of the inmate's person or health. To the extent that this would require ordering the state system to act, the request must be denied, because the operation of the state system is not at issue here. There is no evidence that the health services which will be required in this action will be insufficient to protect the health of state pretrial detainees.

The defendants have agreed to refrain from using the designations "colored" or "C" to refer to black inmates. This issue is moot.

## JAIL FACILITIES

The court made a personal inspection of the jail facilities. It was determined that some of the cells were incorrectly described in the agreed statement of facts. This has been corrected in that portion hereinbefore set out. Because of the square feet available, the shape of the cells, and the arrangement of the beds, not more than the number of persons indicated will be held in each cell as set out subsequently in this court order.

## CONCLUSIONS OF LAW.

■ This court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331, 1343(3) and 1343(4).

This court has pendent jurisdiction over claims arising under the laws of the State of Alabama and deriving from a common nucleus of operative fact. *Miller v. Carson*, 563 F.2d 757, 760–62 (5th Cir. 1977); *Taylor v. Sterrett*, 499 F.2d 367, 368 (5th Cir. 1974).

The plaintiff class satisfied the requirements of *Fed.R.Civ.P.* 23(a) and (b)(2).

■ The defendants Donald Lolley, Charles V. Ford, E. C. Arrington, Julian Johnson, Grady Mosley and Oliver Sealy are agents of Choctaw County, Alabama, and the defendant Commissioner of the Department of Corrections is an agent of the State of Alabama. Their actions constitute acts under color of law as provided by 42 U.S.C.

§ 1983. *See Perez v. Sugarman*, 499 F.2d 761 (2d Cir. 1974).

■ Although federal courts are reluctant to interfere with the administration of state penal institutions, the courts will act to prevent violations of prisoners' fundamental rights. *Procunier v. Martinez*, 416 U.S. 396, 404–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224, 235–36 (1974); *Williams v. Edwards*, 547 F.2d 1206, 1211–12 (5th Cir. 1977); *Pugh v. Locke*, 406 F.Supp. 318, 328 (M.D.Ala.1976), *aff'd in part and rev'd in part sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *cert denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).

■ The Eighth Amendment prohibition against cruel and unusual punishment "is not limited to specific acts directed at selected individuals, but is equally pertinent to general conditions of confinement that may prevail at a prison." *Gates v. Collier*, 501 F.2d 1291, 1301 (5th Cir. 1974).

■ Housing an excessive number of inmates in a jail constitutes cruel and unusual punishment. *See Pugh v. Locke*, 406 F.Supp. 318, 328–29 (M.D.Ala.1976). Beyond the number hereinafter set out, past experience has demonstrated, the jail facilities are overloaded, inmates do not have sufficient living space, and the danger of friction among inmates becomes significant. No minimum square footage will be established in this case; the past overcrowding is unlikely to occur again, and was a result of special circumstances. The present jail population does not approach the number proscribed. If overcrowding occurs again, the court can re-examine its holding in light of the facts as they exist then.

## FIRE SAFETY VIOLATIONS

■ The defendants' failure to correct the fire safety violations as ordered by the State Fire Marshal violates the inmates' Eighth and Fourteenth Amendment rights and Alabama Code § 36–19–11. *Williams v. Edwards*, 547 F.2d 1206, 1214 (5th Cir. 1977); *Gates v. Collier*, 501 F.2d 1291, 1301, 1303 (5th Cir. 1974); *Adams v. Mathis*, 458 F.Supp. 302, 308–309 (M.D.Ala.1978).

## HEALTH CARE DELIVERY

■ Medical and dental services in the Choctaw County Jail do not meet minimum constitutional standards. The court has found numerous deficiencies, which may be grouped under six heads: (1) failure to screen inmates for contagious diseases; (2) insufficient review by trained medical personnel of decisions made regarding the care to be provided in individual cases; (3) undue and unexplained delays in the delivery of health care; (4) lack of training for jail personnel in basic emergency health techniques; (5) use of inmate trusties to· dispense drugs and to make records of drugs dispensed; (6) insufficient records of health care delivered. These health care services are so inadequate as to violate the Eighth Amendment. *Williams v. Edwards*, 547 F.2d 1206, 1215–18 (5th Cir. 1977); *Newman v. Alabama*, 349 F.Supp. 278 (M.D.Ala. 1972), *aff'd in pertinent part*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *see Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251, 259–60 (1977).

■ The defendants have a duty to provide health care to an inmate where failure to do so would result in pain or suffering to the inmate. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1977). Such situations include emergencies and cases where an inmate is actually in pain. On the other hand, the defendants are under no duty to provide prosthetic devices such as eyeglasses or dentures, or to provide routine diagnostic care for inmates. These services are not provided by Choctaw County to its free world citizens, and a person does not gain a greater right to services or benefits upon being convicted of a criminal offense. *Fant v. Fisher*, 414 F.Supp. 807, 808 (W.D. Okl.1976); *cf. James v. Wallace*, 382 F.Supp. 1177, 1180 (M.D.Ala.1974) (right to rehabilitative services denied).

County jails hold prisoners for a relatively short period of time; among persons held by the Choctaw County Jail for more than three days, only eight were held there for more than two years. The incidence of prisoners being held even two years will decrease under the provisions of the order

to be entered in this action, which will require the transfer of state prisoners to state facilities within thirty days.

This case is therefore distinguishable from *Newman v. Alabama*, 349 F.Supp. at 286–88, where the right to prosthetic care was upheld for inmates in a long–term facility.

Adequate health care requires that personnel providing services be trained to perform the tasks required of them. *See Williams v. Edwards*, 547 F.2d at 1215–18; *Newman v. Alabama*, 349 F.Supp. at 286–88. The decision to provide medical treatment for a particular complaint should be made or reviewed by persons trained in diagnosing health problems, such as a nurse or physician. Jail personnel should be trained in basic health care delivery and *must* be trained in emergency health techniques.

The failure to keep adequate medical records constitutes a danger to the lives and health of inmates. The defendants have a duty to maintain complete medical records on each inmate. Records should also be kept on drugs administered to inmates. *See Newman v. Alabama*, 349 F.Supp. at 286–87.

The defendants by their failure to have prisoners regularly examined for venereal disease are not in accord with Alabama Code § 22–16–7, which requires all persons confined in a jail or prison to be examined for venereal disease.

Defendant Sheriff Donald Lolley has not provided adequate medical care to the prisoners of Choctaw County. See Alabama Code § 14–6–19.

The Choctaw County Commission defendants are in violation of this court's preliminary injunction in their failure to hire medical personnel to provide adequate medical care to the inmates of Choctaw County. Alabama Code § 14–6–20 does not impose a duty upon the county commission, but empowers it to do certain acts.

The Commissioner of the Department of Corrections has not performed statutory obligation under Alabama Code § 14–3–41 by failing to insure that tubercular inmates were removed from the jail. Adequate medical care requires that other inmates be protected by immediate testing, and medication if required. *Smith v. Sullivan*, 553 F.2d 373 (5th Cir. 1977). Alabama Code §§ 14–1–12, 14–3–43 and 14–6–60 do not impose any duties upon the commissioner, but empower him to do certain acts.

## FOOD SERVICE

■ The failure to properly prepare and serve nutritionally adequate food to inmates who are unable, due to their confinement, to seek alternative sources of nutrition constitutes a violation of the inmates' Eighth and Fourteenth Amendment rights. However, the shortcomings of the defendants do not rise to such violations. *See also* Alabama Code §§ 14–6–40, 14–6–97, for obligations of the sheriff; Alabama Code §§ 14–6–41(b), 22–3–5(3), for the duties of the County Commission; Alabama Code §§ 14–6–41 and 22–3–5(3), for the duties of the Commissioner of the Department of Corrections.

## INADEQUATE PERSONNEL

■ Failure to provide adequate personnel to insure security at the jail and the continued use of inmate trusties to carry out sensitive tasks such as carrying the keys and distributing drugs violates the Eighth Amendment. *See Newman v. Alabama*, 349 F.Supp. at 286–87; *cf. Williams v. Edwards*, 547 F.2d at 1213 (number of guards required to be increased).

See Alabama Code § 14–6–105 concerning the defendants' duties to provide sufficient personnel to guarantee the security of the jail and safety of the inmates.

## NO CLASSIFICATION

■ Each inmate has a right to be secure in his person from violence, physical abuse, and contagious disease. In *Jones v. Diamond*, 594 F.2d 997, 1016 (5th Cir. 1979), *rehearing en banc granted*, 602 F.2d 1243 (5th Cir. 1979), the Fifth Circuit required a classification policy which would protect pretrial detainees from "violent, disturbed and contagiously ill individuals." Lower courts have ordered pretrial detainees segregated from convicted felons; persons suf-

fering from alcoholism or narcotics addiction from the general population; and persons with contagious diseases segregated.

## RECREATION

The evidence in this case established that outdoor exercise for one hour per day is appropriate.

## CELL ASSIGNMENTS AND PUNISHMENT

■ Transfers of prisoners where a "serious loss" results require a hearing meeting the requirements of due process. *See Jones v. Diamond*, 594 F.2d 997, 1017 (5th Cir. 1979); *United States ex rel. Gereau v. Henderson*, 526 F.2d 889, 895–96 (5th Cir. 1976). Where an inmate is placed in "the hole," he suffers a serious loss because of the physical conditions of that confinement, and due process requires a hearing as described in the court's order on the preliminary injunction. *See McKinnon v. Patterson*, 568 F.2d 930 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

■ On the other hand, moving an inmate from one cell to another within the Choctaw County Jail does not of itself inflict a "serious loss" upon that inmate, even where he is moved for misconduct or for his own safety. Apart from "the hole," the differences among the various cells are insubstantial. Further, an inmate has no right to choose the cell which he will occupy, or to have a particular cellmate, or to have a cellmate at all. Outside the limited circumstance of "the hole," this court will not interfere with the assignment of cells. The protections of the due process clause are "subject to restrictions imposed by the practical necessities of prison life and the legitimate aims of the correctional process." *United States ex rel. Gereau v. Henderson*, 526 F.2d at 895; *see Jones v. Diamond*, 594 F.2d at 1017. Among these restrictions is that the sheriff must be able to assign cells and to separate inmates when he deems it necessary. An inmate may, of course, be moved to another cell, upon his request, for his own protection.

## ACCESS TO COURTS AND COUNSEL

■ Inmates who wish to consult with an attorney must be provided with a reasonable degree of privacy. *See Jones v. Diamond*, 594 F.2d 997, 1024 (5th Cir. 1979); *Ahrens v. Thomas*, 434 F.Supp. 873, 898 (W.D.Mo.1977).

The issue of the legal research facilities to be made available to inmates will await the decision of the Court of Appeals for the Fifth Circuit in a case now pending before that court.

## VISITATION, TELEPHONE AND MAIL

■ Pretrial detainees have the right to such reasonable visitation as is commensurate with jail security. The visitation schedule may not be determined solely on the basis of any inconvenience which it might cause jail personnel. *Jones v. Diamond*, 594 F.2d at 1013; *Miller v. Carson*, 563 F.2d at 748 n.9. The present restrictions on visitation are greater than those which are necessary to ensure jail security, and therefore violate the First Amendment. *See Ahrens v. Thomas*, 434 F.Supp. 873, 898–99 (W.D.Mo.1977). Particularly, visiting hours are presently scheduled when many would–be visitors are working, that is, from 2:00 to 4:00 p. m. on Mondays and Thursdays. This schedule, as shown by the Sheriff's testimony is justified only by the convenience of the jail personnel. It should be changed to provide for visiting hours when more persons will be able to visit without having to be excused from work; for example, on weekends or holidays, or in the evenings.

■ Pretrial detainees have the right to reasonable visitation from their children, *Valentine v. Englehardt*, 474 F.Supp. 294 (D.N.J.1979), under the circumstances and with the limitations described above.

Pretrial detainees are entitled to reasonable use of the telephone at reasonable times.

■ Pretrial detainees and convicted inmates [collectively, "inmates"] retain the

right to communicate by mail as guaranteed by the First Amendment. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Jail officials have the right to censor, inspect or withhold inmate mail only where there is reason to believe that the communication "pose[s] a substantial threat" to jail security, as in the case of contraband, or to other viable state interests. *See Guajardo v. Estelle*, 580 F.2d 748, 756–57 (5th Cir. 1978).

■ Jail officials have an obligation to ensure the prompt forwarding of mail to inmates. *Bryan v. Werner*, 516 F.2d 233 (3rd Cir. 1975). Inmates in a county jail are entitled to receive books, magazines, newspapers, and other correspondence through the mail, subject only to reasonable inspection. *Guajardo v. Estelle*, 580 F.2d at 760–62; *Stewart v. Gates*, 450 F.Supp. 583, 586 (C.D.Cal.1978)

### RELIGIOUS PROGRAM

■ Besides being a right guaranteed by the First Amendment, the free exercise of religion can provide positive rehabilitative benefits to an inmate. Custodial officials must afford inmates a reasonable opportunity to practice their religious beliefs. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263, 268 (1972).

### GENERAL CONCLUSIONS

■ The totality of the conditions in the Choctaw County Jail violates the inmates' right to be free of cruel and unusual punishment as guaranteed by the Eighth Amendment, and pretrial detainees' due process right not to be punished as guaranteed by the Fourteenth Amendment. *See Jones v. Diamond*, 594 F.2d 997, 1003 n.1 (5th Cir. 1979).

■ The decision to withhold resources from the jail cannot be an adequate justification for depriving inmates of their constitutional rights and of their rights under the laws of the State of Alabama. *Gates v. Collier*, 501 F.2d 1291, 1319–20 (5th Cir. 1974); *see Miller v. Carson*, 563 F.2d 741, 747–48 (5th Cir. 1977); *Mitchell v. Untreiner*, 421 F.Supp. 886, 896–97 (N.D.Fla.1976).

■ The Commissioner of the Department of Corrections has violated the rights of inmates held in Choctaw County Jail by failing to exercise his duty under Alabama law to insure that the jail meets the standards prescribed pursuant to Alabama Code § 14–6–81.

### ORDER

The defendants, Choctaw County, Alabama; Donald Lolley, individually and as Sheriff of Choctaw County, Alabama; Charles V. Ford, individually and as Probate Judge of Choctaw County, Alabama; E. C. Arrington, Julian Johnson, Grady Mosley, and Oliver Sealy, individually and as Commissioners of Choctaw County, Alabama; and Robert Britton, the Commissioner of the Department of Corrections of the State of Alabama, their agents, servants or employees, and any and all persons acting in concert with any of them, are hereby permanently ENJOINED from failing to implement this order as follows:

### DUE PROCESS BEFORE CONFINEMENT IN THE PUNITIVE ISOLATION CELL

To provide the inmates with disciplinary rules which conform with this court's preliminary injunction of September 20, 1978. The defendants will revise the disciplinary rules and submit them to the plaintiffs within 30 days of this order. The plaintiffs will have 10 days to comment. The revisions will include a list of violations, a clear description of each violation, and possible penalties for each violation.

To implement the provisions of the preliminary injunction dated September 20, 1978, concerning "Due Process Before Confinement in the Punitive Isolation Cell," paragraphs (2) through (10).

### HYGIENIC ITEMS

To implement the provisions of the preliminary injunction of September 20, 1978, concerning "Hygienic Items," paragraphs (1) through (5).

SAFE AND SANITARY CONDITIONS

To implement the provisions of the preliminary injunction of September 20, 1978, concerning "Safe and Sanitary Conditions," paragraphs (1) through (3).

To construct a fire escape from the second floor within a reasonable period of time. The defendants will inform the court in writing, within 45 days of this order, of the expected completion date.

To install fire extinguishers within 15 days of the date of this order on the second floor west side in the female section, and in the male section of the second floor on the east side, pursuant to the order of the State Board of Corrections jail inspection report of April 19, 1978.

PLUMBING

To implement the provisions of the preliminary injunction of September 20, 1978, concerning "Plumbing," paragraphs (1) through (5).

HEALTH CARE

To implement the provisions of the preliminary injunction of September 20, 1978, with regard to "Health Care," paragraphs (1)–(7).

To contract with the Choctaw County Health Department to go to the jail on a weekly basis to administer tests for venereal disease pursuant to Alabama Code § 22–16–7 and for tuberculosis to any inmates who have entered the jail during that week. If any test is positive, every person confined at that time in the jail shall be tested. The person whose test is positive shall be quarantined in the jail or at another suitable place separate from the regular jail population in compliance with Alabama Code § 14–6–60. The Sheriff will report any cases of positive results of venereal disease or tuberculosis tests to the court and to the Alabama Department of Health Services.

Where an inmate who was tested for tuberculosis at the Choctaw County Jail and who was identified as a positive reactor, is presently incarcerated in the state prison system, to notify the appropriate state prison authorities of the inmate's identity and of the results of the tuberculosis test within 14 days of this order, and to isolate the inmate immediately.

To train all jail personnel in basic health care emergency techniques, and to give them basic instruction in how to identify and handle persons with health problems such as intoxication or mental illness. The sheriff shall contact the local office of the Choctaw County Mental Health Department, or other sources of such training within the Butler community in order to secure this training. Persons who are later employed in the Choctaw County Jail shall also receive this training. Any person supplying training shall be adequately trained in his field.

Where a decision is made by jail personnel not to provide an inmate with medical care by a registered nurse or a doctor, to have the decision reviewed by a person trained in making such a decision, such as a nurse or a doctor within 24 hours of the jail employee's decision. If the person reviewing the decision wishes to consult a doctor or states that the inmate should receive further medical care, the inmate shall receive the care prescribed.

To give inmates entering the Choctaw County Jail the opportunity, and to help them, to fill out a health screening form containing at least the information requested in the form attached as Exhibit I to this order.

To discontinue the services of any dentist serving the jail who states that he will only extract an inmate's teeth as emergency treatment, and to make dental care arrangements with another dentist who is willing to provide not only extraction service but also such other emergency dental care as a dentist may determine to be necessary. The County shall not be required to contract for or to pay for general preventive dental care.

To implement the record keeping system on medical requests established as a result of the preliminary injunction order, paragraph V. (5), with the following additions:

(1) the date of the request for medical treatment will be added to the forms;

(2) the doctor(s) will be requested to write prescriptions for diagnoses and treatment so that jail personnel can read them in order to give proper care to the inmates.

The revised form will be submitted to the plaintiffs' counsel within 14 days of the entry of this order.

To implement the record keeping system for the administration of drugs established in the preliminary injunction order, paragraph V. (2), with the following additions:

(1) the quantity of medicine as set out on the label of the drugs provided will be added to the form;

(2) the prescription including the frequency of administration of drugs will be set forth on the forms;

(3) the forms will require an indication of A.M. or P.M. when recording the time of distribution of drugs.

## TRUSTY SYSTEM

To abolish the use of trusties as assistant jailers, guards, etc. Trusties may be used for other duties such as assistance in the kitchen, clean up patrol, or general errands.

## PERSONNEL

To hire sufficient personnel so that an inmate trusty will never be employed to perform the duties of a jailer, including communicating by radio and telephone with deputy cars across the county; receiving, handling and dispatching complaints to the deputy cars; handling other telephone calls to the jail; custody of the keys; administration of drugs; making decisions concerning whether a nurse, physician's assistant or doctor is called for a visit from an inmate; and hourly patrol of the cells. Sufficient personnel shall be hired for round–the–clock patrolling of the cell areas by free world personnel.

## RECREATION

To provide each inmate an opportunity for outdoor recreation for at least one hour each day weather permitting. This shall include persons who are in administrative or punitive isolation.

## NUTRITIONALLY ADEQUATE FOOD

To implement the provisions of the preliminary injunction of September 20, 1978, concerning "Food," paragraphs (1) and (2).

To have tested any outside kitchen personnel employed by the sheriff or the County Commission, prior to beginning work in the kitchen and at least quarterly thereafter, by the Choctaw County Health Department for tuberculosis, venereal disease and other communicable diseases. If any complaint or symptom of tuberculosis or other communicable disease including skin disorders is discovered, that employee will be referred to a medical doctor for appropriate examination, and his or her employment will be discontinued in the kitchen until he has received a clean bill of health. If at any regular inspection by the County Health Officer such conditions exist the same procedure will be followed.

To ensure that, before an inmate is permitted to handle food for service to other inmates, and each three months thereafter, he has been tested by the County Health Department and has received a certificate or other evidence approving the person medically fit to handle food.

To obtain a copy of the Alabama Department of Public Health Regulations Governing the Manufacture, Preparation, Display, and Service of Foods, Confections and Beverages and will make that available to the cook and all other personnel in the kitchen. They will be instructed that these regulations apply to service of food in the jail.

No meat from an animal killed on the highway or road, or deer or other wild game which is butchered at the jail unless by persons adequately trained to inspect and butcher meat, shall be served in the jail.

To correct immediately any deficiencies noted by the Choctaw County Health Department in its inspection reports concerning food service.

To store food that has been served at one meal in such a manner that it will not spoil, or become infested with vermin, if it is to be served at a subsequent meal.

## VISITATION

To establish visiting hours which shall include at least two hours on either Saturday or Sunday between the hours of 8:00 a. m. and 6:00 p. m. There will be no refusal to a person to visit the jail during visiting hours unless he is diseased or unless there is reason to believe that he is a threat to jail security. Children will be permitted to visit parents in the jail.

## MAIL HANDLING

Not to open outgoing and incoming mail to and from attorneys, courts, and government agencies except where there is reasonable cause to believe sealed communications or contraband is enclosed.

To train and issue written instructions to those opening mail and packages to insure the safekeeping of money, contraband or anything removed from incoming mail and packages.

To allow prisoners to receive any publications they choose and as frequently as they choose provided the publication is not obscene or provides information of escape.

## RELIGIOUS INSTRUCTION AND GUIDANCE

To assist, upon request by an inmate, in obtaining visits to the jail by a minister of the inmate's choice or by a minister of the religion or faith requested by the inmate if the inmate does not know the name of the specific minister. A minister may visit the jail between the hours of 8:00 a. m. and 5:00 p. m. Discussions and meetings with ministers shall be held in private, if requested. Religious services may be held on a voluntary basis in an area designated by the sheriff separate and apart from those not desiring to participate, subject to jail security.

## CLASSIFICATION OF INMATES

To establish a classification system which shall at least separate the following groups: juveniles, females, pretrial, and mental detainees; and among persons who have been convicted misdemeanants from felons, and separate violent prone from others.

## JAIL FACILITIES

To hold no more than the number of persons indicated in each cell:

| Cell Location | Square Feet | Maximum Number to be Housed | Toilet-Lavatory Shower |
|---|---|---|---|
| Ground Floor | | | |
| S/E | 112 | 3 | Yes |
| N/E | 112 | 3 | Yes |
| S/W | 133.7 | 4 | Yes |
| N/W–Hole | 133.7 | | |
| Top Floor | | | |
| Female S/E | 80 | 2 | Yes |
| Female N/E | 80 | 2 | Yes |
| Male N/E–S (Day Room) | 186.3 (Max.– Day Room–10) | 4 (for sleeping) | Yes |
| Male N/E–N | 122.6 | 3 | No shower |
| S/W (Day Room) | 104.5 (Max.– Day Room–6) | 3 (for sleeping) | Yes |
| N/W central (1) | 122.6 | 3 | No shower |
| N/W central (2) | 122.6 | 3 | No shower |
| N/W–N | 122.6 | 3 | No shower |

In case of an emergency, all the present bunks may be used even though in excess of the limitations set out herein. If it is necessary for an excess number to be housed for more than 7 days consecutively, the court and attorneys for the plaintiffs shall be notified.

## ACCESS TO LAWYERS AND LEGAL MATERIAL

To permit attorneys to visit the jail at any reasonable time.

To make available a cell on the first floor for attorney–client conferences at which time there will not be any other inmates or jail personnel present.

To permit inmates to telephone their attorneys between the hours of 8:00 a. m. and 6:00 p. m. There shall be no period upon initial entry, to wit, 24 hours, into the jail in which an inmate is denied access to the telephone to call his or her attorney.

To ask a notary public to come to the jail to notarize papers for an inmate for court proceedings, upon the written request of the inmate.

LAW LIBRARY TO BE RESOLVED AFTER A DECISION IN THE FIFTH CIRCUIT.

## STATE INMATES

To remove any inmate who has been tried, convicted, and sentenced and who is thus a state prisoner, in the Choctaw County Jail for a period greater than 30 days after sentencing.

The plaintiffs are entitled to reasonable attorneys' fees which will be determined at a later time.

Costs are taxed against the defendants.

### EXHIBIT I

Jail Health Screening

This form can be either self administered or filled out by jail personnel on Admission to the facility. All yes answers must be reviewed by some health professional trained in using screening forms.

Name: _____

Age: _____

| Have you ever had: | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| 1. Hepatitis (yellow skin) | ___ | ___ | Have you ever had any | | |
| 2. Asthma (wheezing) | ___ | ___ | allergies to what | | |
| 3. Venereal Disease | ___ | ___ | Food | ___ | ___ |
| Gonorrhea | ___ | ___ | Drugs | ___ | ___ |
| Syphilis | ___ | ___ | Other | ___ | ___ |
| 4. Diabetes | ___ | ___ | | | |
| 5. High blood pressure | ___ | ___ | | | |
| 6. Epilepsy (seizures) | ___ | ___ | | | |
| 7. Heart trouble | ___ | ___ | | | |
| 8. Stomach ulcers | ___ | ___ | | | |
| 9. Problems with drugs | ___ | ___ | | | |
| 10. Problems with alcohol | ___ | ___ | | | |
| 11. Tuberculosis | ___ | ___ | | | |

|  | Yes | No |
|---|---|---|
| Have you ever had any mental problems | — | — |
| Have you ever been hospitalized for this | — | — |
| Have you been hospitalized within the last two years | — | — |
| Are you on any current medicines | — | — |
| Do you have any health problems now? What? | — | — |