**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 99-20209

MATTHEW JAMES LEACHMAN,

Plaintiff - Appellant,

VERSUS

TOMMY B. THOMAS,

Defendant - Appellee.

Appeal from the United States District Court
For the Southern District of Texas
(H-97-CV-1722)
August 9, 2000

Before DAVIS, DUHÉ, and DENNIS, Circuit Judges.

PER CURIAM:[1]

In this *pro se* civil rights suit for injunctive and declaratory relief under 42 U.S.C. § 1983, Matthew James Leachman ("Leachman"), a detainee in the Harris County Jail (the "Jail"), appeals the district court's grant of summary judgment to Harris County Sheriff Tommy B. Thomas ("Sheriff Thomas"). We affirm.

---

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**BACKGROUND AND STANDARD OF REVIEW**

Leachman's complaint centers on the Jail's policies concerning prisoners' rights to receive and to keep: publications, greeting cards, and envelopes.[2]  We afford prison officials wide deference in establishing and enforcing their regulations.  See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 126 (1977).  We must uphold prison restrictions if they are reasonably related to a facility's legitimate penological interest in such areas as security, order, and rehabilitation of the inmates.  See Guajardo v. Estelle, 580 F.2d 748, 753 (5th Cir. 1978).

In order to determine what regulations meet the penological interest standard, courts employ the four factor test enunciated in Thornburgh v. Abbott, 490 U.S. 401 (1989):

> 1.    Whether the penological objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective;
>
> 2.    Whether there are alternative means of

---

[2]Although in the district court Leachman challenged the Jail's policy forbidding prisoners from receiving colored pens, pencils, and highlighters, he does not address these items in his briefs to this court.  Leachman has therefore waived these issues on appeal.  See Yohey v. Collins, 985 F.2d 222, 225 (5th Cir. 1993).  Moreover, Leachman expressly waived his challenge to the Jail's ban on prisoners' receiving stationery.  We address Leachman's summarily briefed challenge to the Jail's ban on perfumed letters in our discussion of the greeting card policy.  See discussion infra Part II and note 4.

Leachman makes a subsidiary argument that the district court denied him a fair hearing on summary judgment.  This allegation is without merit.  We find no error in the district court's handling of this matter.

exercising the rights that remain open to inmates;

> 3. What impact the accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison, and

> 4. Whether there are ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

See id. at 414-18. The district court ruled on summary judgment that each challenged regulation met this test.

We review a grant of summary judgment de novo, viewing the facts and inferences in the light most favorable to the party opposing the motion. See Hall v. Gillman, Inc., 81 F.3d 35, 36-37 (5th Cir. 1996). Summary judgment is appropriate only if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We address each of Leachman's complaints in turn.

**DISCUSSION**

## I. Publications

Leachman challenges five Jail regulations concerning prisoners' receiving and accumulating publications: (1) the Jail's requirement that an inmate seek prior approval from the Jail Librarian before ordering a publication; (2) the Jail's "Publishers Only" policy that, according to Leachman, forbids prisoners from directly receiving a publication from anyone other than the

3

publication's publisher; (3) the Jail's requirement that an inmate prepay for publications and receive a letter from the publisher confirming this prepayment; (4) the Jail's prohibition on inmates' retaining more than three publications at a time; and (5) the Jail's prohibition on inmates' receiving and/or possessing hardbound books.

## A. Prior Approval

Leachman insists that the prior approval policy is unconstitutional in that it allows Jail officials to refuse inmates' requests for publications without first reviewing and making a factual determination that the publications are detrimental to a valid penological interest. See Guajardo, 580 F.2d at 762. Leachman's attack on the Jail's prior approval policy fails both as a facial and an "as applied" challenge. We note first that there is some question as to the proper standard of proof for when a plaintiff asserts a facial challenge to a statute or regulation. See Okpalobi v. Foster, 190 F.3d 337, 353 (5th Cir. 1999) (comparing United States v. Salerno, 481 U.S. 739, 745 ("[T]he challenger must establish that no set of circumstances exists under which the Act would be valid") with Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 895 (stating that abortion regulation is facially invalid if "in a large fraction of cases in which [it] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion."). We need

4

not resolve this apparent conflict here, however, because the record indicates clearly that the prior approval policy would meet constitutional muster under both tests. There could be many instances where the title and publisher would clearly indicate the suitability of the publication.

Turning to the constitutionality of the regulation as applied in this case, Leachman has failed to demonstrate a cognizable violation of his constitutional rights. Overarching this discussion of the prior approval policy is the established fact that the Jail has a valid penological interest in preventing the dissemination of literature that would have a detrimental effect upon the safety and/or rehabilitative interests of the facility. See Guajardo, 580 F.2d at 761-62. To this end, facilities may censor the reading materials given to prisoners. See id.

Leachman presented evidence that the Jail denied his request for a book published by Jove Publications entitled Soldier of Fortune. This is the only example in the record of Leachman's having been denied a request for a publication. Leachman opines that the Jail denied his request on the mistaken belief that he was requesting *Soldier of Fortune* magazine, a prohibited work. We note first that this request was submitted and denied months after Leachman filed suit which suggests that he had not suffered a cognizable injury at the time he filed suit. Moreover, Leachman did not avail himself of the Jail's appeals process in which he

could have explained that he was not requesting the magazine and presented his case for why he should be allowed to purchase the allegedly innocuous book.  In addition, if Leachman's supposition is right, a Jail official made a reasonable although perhaps erroneous factual determination that this book was "Not Authorized" and therefore justifiably denied the request.  Ultimately, Leachman has failed to produce any evidence that the Jail applied this statute in an unconstitutional manner.

## B. Publishers Only Rule

Leachman is incorrect in asserting that the Jail has a "Publishers Only" rule that prohibits him from purchasing publications from any source other than publishers, i.e. bookstores.  Although direct purchasing through a publisher appears to be the Jail's preferred means of inmates' acquiring publications, evidence indicates that an inmate may accept reading materials from a bookstore.  Accordingly, such a policy meets constitutional muster under Guajardo and by extension Thornburgh:

> [T]he security risk created by permitting inmates to receive books from friends or relatives supports this [Publishers Only] rule.  We also agree that with respect to legal material the defendant institution's willingness to include bookstores as publications suppliers and the prison law library sufficiently alleviate any infringement on the right of access to the court.

Guajardo, 580 F.2d at 762.

## C. Prepayment

6

The district court found that the Jail implemented its prepayment requirement in order to prevent inmates from defrauding book sellers by ordering and receiving publications without paying for them. That a jail has a legitimate penological interest in preventing incarcerated individuals from committing further crimes is axiomatic. See Pell v. Procunier, 417 U.S. 817, 822 (1974). Similarly, we agree with the district court that this regulation meets the second prong of Thornburgh because it does not preclude inmates from purchasing publications, thus obviating the need for alternative means of asserting this right.

We agree with the district court that Leachman has produced no credible evidence calling into question the facts that publishers are clearly at risk from inmate fraud and that there are no adequate alternative means to address this problem.

**D. Three Publications Rule**

We agree with the district court that under Thornburgh the Jail has articulated a significant penological interest in avoiding fire hazards by limiting the number of publications an inmate may possess at any given time. See Cruz v. Hauck, 515 F.2d 322, 333 (5th Cir. 1975) (holding that county jail's limitation on number of books kept by prisoners was reasonable in light of duty to maintain security and protect against the dangers of fire).

Leachman's assertion that the exception to the Three Publications Rule for religious publications violates the

7

Establishment Clause is wholly without merit. Indeed, as the district court indicated, this exception is properly designed to avoid infringing upon inmates' rights to religious expression. The regulation neither requires inmates to possess religious materials, nor prohibits them in any way from doing so. Leachman has produced no evidence that the exception's primary effect is to advance religion in violation of the Establishment Clause or that it creates an excessive "entanglement" between church and state. See Lynch v. Donnelly, 465 U.S. 668 (1984). Moreover, the exception is content neutral in that it also allows inmates to acquire an unlimited number of publications related to correspondence classes.

**E. Hardbound Books**

Leachman does not dispute that hardbound books pose a substantial threat to prison security as they present a ready vehicle for the smuggling of contraband. See Bell v. Wolfish, 441 U.S. 520, 550-51 (1979) ("It hardly needs to be emphasized that hardback books are especially serviceable for smuggling contraband into an institution; money, drugs, and weapons easily may be secreted in the bindings.") Moreover, as the district court noted, the purchase of softbound books in lieu of hardbound books is certainly a reasonable alternative means of exercising prisoners' rights. Additionally, a policy exists for seeking an exception to the rule for hardbound books necessary for correspondence classes. Similarly, there is an exception to the rule for publications from

the Church of Jesus Christ of Latter Day Saints and the Gideons that each produce their respective religious tracts only in hardbound form.[3]  Leachman simply fails to demonstrate an issue of material fact as to the reasonableness of this prohibition under Thornburgh.

## II. Greeting Cards

Leachman contends that Sheriff Thomas failed to demonstrate a legitimate penological interest in banning greeting cards and that the Texas Commission on Jail Standards has not expressly banned greeting cards in its correspondence regulations.  See 37 TEX. ADMIN. CODE § 291.2.[4]  The record clearly indicates that the thick card stock used in making greeting cards can be used both to smuggle contraband between its folds and as "blotter paper" that can be infused with liquified drugs.  Undisputed summary judgment evidence shows that card stock's thickness can thwart the "flex test[5]" used by the Jail to search for contraband in incoming mail.

_____

[3]For the same reasons as stated in D. above, this is not a violation of the Establishment Clause.

[4]Leachman insists that the Jail's ban on perfumed letters is similarly void under this analysis.  We disagree.  Sheriff Thomas demonstrated that perfumed letters pose a drug trafficking risk by masking smells and can lead to inmate unrest as prisoners may fight over such desirable items.  Leachman does not demonstrate a valid personal liberty interest in receiving perfumed letters that would outweigh these penological interests.  Thus, we conclude that the ban on perfumed letters is a legitimate exercise of the Jail's authority under Thornburgh.

[5]The record indicates that although Jail officials open and search prisoners' mail, "flexing" the items to test for rigid contraband is an important adjunct to the screening process.

9

Moreover, Jail regulations permit receiving greeting cards photocopied onto regular paper and therefore maintain an alternate means of exercising the right to receive greeting cards. Finally, this regulation is consistent with the cited correspondence regulations. Despite Leachman's unsupported protestations to the contrary, this regulation unequivocally meets <u>Thornburgh</u> muster.

## III. Envelopes

Leachman insists that the Jail arbitrarily seizes all envelopes sent to prisoners. Leachman is mistaken.

The record indicates that smugglers can mix liquid drugs with the glue used to fasten envelopes. Similarly, individuals can hide various forms of contraband in the insulation of padded envelopes. Finally, lewd drawings inscribed on the outside of letters can pose a significant risk to the prison community by promoting deviant sexual activity. The prevention of each of these potential harms is a valid penological interest. Leachman does not contest this; but rather, insists that all envelopes are seized without analysis by prison officials. Sheriff Thomas presented overwhelming evidence that envelopes are given to inmates; and that even in those instances when Jail officials seize envelopes, they are careful to excise the illegal content and to give the inmates any remaining portions of the envelope.[6] Ultimately, Leachman's

---

[6]The record indicates that in most instances this entails the clipping off of the address and return address portions of the envelope, which officials then turn over to the inmate along with the contents of the envelope.

10

unsubstantiated, anecdotal evidence of universal seizure is insufficient to create a material issue of fact that the Jail's envelope policy violates his constitutional rights.

AFFIRMED.

Dennis, Circuit Judge, dissenting.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution[;] nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the inside[.]" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (citing *Turner v. Safley*, 482 U.S. 78, 84, 94–99 (1987)). "[P]ublishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." Abbott, 490 U.S. at 408.

Regarding incoming publications, material requested by an individual inmate but targeted to a general audience, regulations affecting the sending of a publication to a prisoner must be analyzed under the *Turner* reasonableness standard. *See id.* at 413. "Such regulations are 'valid if [they are] reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89).

Under the *Turner* standard, in determining reasonableness, (1) there must be a valid, rational connection between the regulation

11

and the legitimate governmental interest put forward to justify it; the logical connection between the regulation and the asserted goal cannot be so remote as to render the policy arbitrary or irrational; the governmental objective must be a legitimate and neutral one; and the regulations restricting inmates' First Amendment rights must operate in a neutral fashion, without regard to the content of the expression. *See Turner*, 482 U.S. at 89-90. Other factors relevant in determining the reasonableness of a prison restriction are (2) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (3) the impact accommodation of the asserted First Amendment right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns, because an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at a *de minimis* cost to valid penological interests. *See id.* at 90-91.

There are several prison regulations in question: the prior-approval and prior-payment regulation; the hardcover publication, greeting card, and perfumed letter bans; and the envelope destruction policy.

The pre-approval pre-payment regulation in question provides that, in order to receive any publication, book or magazine by mail, (1) an inmate must submit a request for prior approval to the

12

jail librarian; (2) the request must contain the name of the publication and the publisher; (3) if the request is approved, the inmate must have the publisher submit, on its letterhead, a document showing proof of payment in full directly to the Sheriff's Department Mail Room; and (4) an inmate may have no more than three publications in his possession at one time, but this limitation does not apply to religious and correspondence course materials. According to a deputy's affidavit, the jail librarian or mail deputy bases his approval of an inmate's request for a publication upon whether the publication, according to its title and publisher, appears to the deputy to be detrimental to the order and security of the prison. An inmate may appeal the denial of a request to the Jail Captain within seven days of the denial. According to another deputy's affidavit, the prior approval and proof of payment rule is designed to prevent inmates from receiving inflammatory or pornographic materials, ordering large numbers of publications without intending to pay for them, creating fire hazards by accumulating excess reading materials, arguing over the ownership of particular publications, bargaining and bartering with publications, and creating health and cleanliness problems.

Except for religious texts and for correspondence course materials, an inmate may not receive or possess any hardcover book. According to a deputy's affidavit, the reason for the hardcover ban is to prevent the smuggling of contraband into the jail.

Inmates are required to advise all persons who may write to

them that they are not allowed to receive greeting cards, pens, pencils, markers, newspapers, magazines, books, stamps, envelopes, obscene pictures, perfumed letters, packages, stickers, cash, or anything that would be considered contraband.  Greeting cards are disallowed, according to a deputy's affidavit, because they may be split and used to smuggle contraband and they cannot be examined by use of the flex test as other mail.  Also, drugs in liquid form may be painted on to cards.  Perfumed letters may be used to disguise drugs and may cause disruptions, according to a deputy's affidavit. With respect to envelopes, the department has no consistent policy, except that, as a general rule, legal mail envelopes are given to the inmates, pornographic and bubble-lined envelopes are not, and inmates may request that addresses be torn off and delivered with the contents.

Applying the principles of *Thornburgh v. Abbott* and *Turner v. Safley* to the prison regulations in question, the regulations or policies pertaining to envelopes, perfumed letters and greeting cards appear to be reasonably related to legitimate security interests, but the ban upon receipt of all hardcover books from any source (except for correspondence courses and religious texts) and the prohibition upon the receipt of any publication without pre-approval and pre-payment do not satisfy the reasonable relationship requirement, but rather constitute an exaggerated response to  the department's rehabilitation and security concerns.

14

First, the pre-approval pre-payment procedure, which severely limits the flow of all published information to prisoners and completely bars any gift publications or any unrequested mail from publishers, has no rational relationship with any legitimate penological interest. The department's policy of allowing the jail librarian to approve or reject an inmate's request for a publication based solely on its title and the name of its publisher, without examining the content of the publication, is not rationally related to security, rehabilitation or any other penological interest. The librarian cannot determine whether the publication will be "detrimental to order and security" without an individual examination of the material. Nor can he articulate any rational basis for approval or disapproval without such an examination. Instead, these regulations fairly invite prison officials to apply their own personal prejudices and opinions as standards for prisoner censorship and do not appear to be unrelated to the suppression of expression. *See Allen v. Higgins*, 902 F.2d 682, 684 (8th Cir. 1990) (citing *Turner*, 482 U.S. at 89) ("In light of the fact that [prison official] Groose had not examined the catalog before making his decision to disallow it, Groose could not have reasonably assessed whether his conduct violated clearly established law. Under these circumstances, we cannot say that the exclusion of the government surplus catalog...was 'reasonably related to legitimate penological interests.'"). Consequently, in

15

the absence of the requested publication and the articulation of a rational basis for disapproval based on individual examination, the inmate's right of appeal is purely illusory. Further, the requirement of proof of prepayment on the publisher's letterhead additionally burdens the flow of First Amendment protected information without being reasonably related to a legitimate penological interest. There is no reason to believe that competent publishers cannot properly assess the credit risks involved in mailing publications to subscribers at prison addresses. On the contrary, it appears that publishers in general have sought to increase the flow of publications into prisons. In *Thornburgh v. Abbott*, for example, the Court noted that the Association of American Publishers, Inc., and numerous individual publishers had argued that their First Amendment rights were violated by the regulations promulgated by the Federal Bureau of Prisons, which broadly permit federal prisoners to receive publications without preapproval or prepayment from the outside, subject to prison officials' authority to reject individual publications detrimental to security.

The federal prison regulations which the Supreme Court held facially valid in *Thornburgh v. Abbott* generally permitted inmates to subscribe to, or to receive, publications without prior approval, but authorized the warden to reject a publication if it was determined detrimental to the security, good order, or

16

discipline of the institution or if it might facilitate criminal activity. The warden could not establish an excluded list of publications. *See Abbott*, 490 U.S. at 405. The regulations provided that each issue of a subscription publication must be reviewed separately. *See id.* The warden could designate staff to screen and approve incoming publications, but only the warden could reject a publication. *See id.* at 406. The warden was required to advise the inmate promptly in writing of the reasons for the rejection, and had to provide the publisher or sender with a copy of the rejection letter. *See id.* The notice had to refer to the specific articles or materials considered objectionable. *See id.* An inmate could appeal through the Bureau's Administrative Remedy Procedure. *See Abbott,* 490 U.S. at 406. The regulations required the warden to permit the inmate to review the rejected material for the purpose of appeal, unless it would pose a threat or detriment to the security, good order or discipline of the institution. *See id.* In *Thornburgh v. Abbott* the Court expressed that it was "comforted by the individualized nature of the determinations required by the regulation.....no publication may be excluded unless the warden himself makes the determination that it is 'detrimental to the security, good order, or discipline of the institution or...might facilitate criminal activity.'" *Id.* at 416 (quoting 28 C.F.R. §§ 540.70(b), 540.71(b) (1988)); *see also Guajardo v. Estelle*, 580 F.2d 748, 755 (5th Cir. 1978)(prison rule

17

requiring inmates to secure prior approval before beginning correspondence with any person within the general public was "akin to a...prior restraint on expression [that] comes to a court with a heavy presumption against its constitutional validity....[and] was not essential to the state's interest in security, order or rehabilitation.").

Second, the numerical possession limit of three publications and the ban on an inmate's receipt or possession of hardcover publications do not appear to be rationally related to a legitimate and neutral governmental objective. *See Abbott*, 490 U.S. at 414 ("The first *Turner* factor is...whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective."). Neither the numerical possession limit nor the hardback book ban applies to correspondence course materials or religious texts. Thus, each inmate may receive and possess an unlimited number of hard and soft back religious texts and correspondence course materials. Consequently, these regulations are neither neutral nor rationally related to the purposes of controlling fire hazards or contraband smuggling as the sheriff contends. Religious and correspondence course texts are no less combustible than other publications. Hardback publications mailed directly from publishers, book clubs and bookstores are as little likely to contain contraband as hard back religious and correspondence course

18

texts.  For similar reasons, this court in *Mann v. Smith*, 796 F.2d 79 (5th Cir. 1986), held that the Midland County, Texas jail's policy of banning newspapers and magazines violated the plaintiff's First Amendment rights:

> Because the jail has a no smoking rule for inmates and because the jailers permit inmates to have other forms of paper and similar materials, the official rationale seems tenuous at best....The patently underinclusive nature of the regulation strongly suggests that it is indeed an exaggerated response; certainly it contrasts with the carefully tailored restriction on hardbound books that was upheld in *Bell v. Wolfish* itself.  Perhaps the jail officials who established this policy had some very important and legitimate purpose that could not be accomplished without denying the inmates access to newspapers and magazines.  If so, the defendants' lawyers have not brought it to our attention, and we have not been able to imagine what it could have been.

*Mann*, 796 F.2d at 82.

The Supreme Court in *Bell v. Wolfish*, 441 U.S. 520 (1979) upheld a policy, far less restrictive than the one at issue in the present case, that limited prisoners' receipt of hardback publications to books which were mailed directly from publishers, book clubs or book stores.  The Court held that the policy was reasonably related to legitimate penological interests because of the prison's concern about contraband concealed in hardback books received by inmates from unidentified sources outside the facility and the burden on prison officials to remove the covers to make sure that contraband had not been secreted.  *Id.* at 550-51. "However," the Court quoted from the warden's affidavit, "'there is relatively little risk that material received directly from a

19

publisher or book club would contain contraband, and therefore, the security problems are significantly reduced without a drastic drain on staff resources.'"  *Id.* at 549.

In sum, although the department had ample opportunity to develop a record, it has offered no justification for its blanket ban on the receipt of all gift publications, its prior restraints upon the flow of information to prisoners by the requirements of preapproval and prepayment of subscriptions, or its lack of neutrality in banning all hardcover publications mailed from publishers, book clubs and book stores, except from publishers of religious and correspondence course texts.  Consequently, there is no valid, rational connection between the prison regulations and the legitimate governmental interests put forward to justify them. In view of the unlimited exceptions for all soft and hard back religious and correspondence course publications, the logical connection between the three publication possession limit and the ban on hardcovers from all publishers, book clubs and bookstores and the asserted goals of fire and contraband control is so remote as to render the policy arbitrary and irrational.  Thus, the restrictions on inmates' First Amendment rights do not operate in a neutral fashion or without regard to the content of the publications.  There are no feasible alternative means open to inmates for obtaining access to an adequate range of publications. The prison regulations in question here represent an exaggerated

20

response to prison concerns because the claimant has pointed to an alternative that fully accommodates the prisoner's rights at a *de minimis* cost to the valid penological interests —- a regulation similar to C.F.R. §§ 540.70 and 540.71 permitting an inmate to subscribe to, or to receive, a publication without prior approval, but vesting authority in the warden to reject a publication if he determines, after review of the publication, that it will be detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity. It may be reasonably inferred from the record that such an alternative would not impose an undue burden or cost upon the department: the Harris County Jail houses inmates awaiting trial or serving relatively short sentences, most inmates will not be in the jail long enough to acquire or to accumulate a substantial library, and the mail deputy declared that he only receives approximately two requests for pre-approval of a publication each month. *See* Appellee's Brief, at n. 4 (citing R-1, 353 (Meinhart Affidavit)) and n. 10. Accordingly, the summary judgment should be reversed and the case remanded for further proceedings.